756 So.2d 1218 (2000)
STATE of Louisiana, Appellee,
v.
Kevin COLEMAN, Appellant.
No. 32,906-KA.
Court of Appeal of Louisiana, Second Circuit.
April 5, 2000.
Rehearing Denied May 4, 2000.
*1225 Indigent Defender Board by John M. Lawrence, Counsel for Appellant.
Richard Ieyoub, Attorney General James M. Bullers, District Attorney, J. Schuyler Marvin, Assistant District Attorney, Counsel for Appellee.
Before NORRIS, WILLIAMS & PEATROSS, JJ.
PEATROSS, J.
Defendant, Kevin Dwayne Coleman, was convicted of two counts of first degree murder by a unanimous jury. The trial court sentenced Defendant to serve two consecutive terms of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant appeals asserting 21 assignments of error. Assignments of error numbers 3, 4, 8 and 16, however, have been abandoned for failure to brief. State v. Henderson, 31,986 (La.App. 2d Cir.8/18/99), 740 So.2d 240; State v. Thomas, 28,790 (La.App.2d Cir.10/30/96), 683 So.2d 1272; URCA Rule 2-12.4. Since we find no reversible error in any of Defendant's remaining assigned errors, Defendant's convictions and sentences are affirmed.

FACTUAL AND PROCEDURAL BACKGROUND
On February 21, 1996, Floyd and Winfred Teetson, 75 and 70 years old respectively, were murdered in the tool shed next to their home in south Webster Parish. The Teetsons were beaten about the head, their throats were slashed and, while they were still alive, a caustic chemical solution was poured down their throats. Money was taken from Mrs. Teetson's purse and Mr. Teetson's pockets and Mrs. Teetson's rings and Mr. Teetson's ring and watch were also taken. The bodies were not discovered until the evening of the following day.
Defendant, who had performed yard work for the Teetsons, became a suspect based on information received by investigators of the Webster Parish Sheriffs Department. Defendant was arrested on an unrelated charge and, while in custody, was questioned regarding the Teetson murders. Initially, Defendant declined to answer questions about the murders. The record reveals, however, that on March 18, 1999, Defendant indicated that he wished to talk to Deputy Gary Valentine. After being read his Miranda rights and having executed a standard rights form, Defendant gave a tape recorded statement. The facts of the crime are revealed largely in this and various subsequent statements given by Defendant to Webster Parish Sheriff's deputies.
During this first statement, Defendant confessed to participating in the murders of the Teetsons and the following is Defendant's description of the events of that day. Defendant and Willie Burks had discussed and made plans to rob the Teetsons. Defendant stated, however, that Mr. Burks did not go with him that day, but that he and another man, Michael Robertson, went to the Teetsons' residence and committed the murders. Defendant admitted that he rode his bike to the area near the Teetsons' home, dropped his bike in the bushes, traveled through the woods to the house and knocked on the door. Mr. Teetson was not home at the time and Mrs. Teetson invited Defendant to sit on the porch with her and wait for Mr. Teetson to return. Defendant then told Mrs. Teetson that he needed a tool to fix his car and the two went to the tool shed. According to Defendant, Mr. Robertson was waiting around the back of the tool shed to assist in the attack on Mrs. Teetson. While in the tool shed, Mrs. Teetson was struck on the head by Mr. Robertson; and, thereafter, the two assailants continued to beat and kick her. At some point after Mrs. Teetson had been beaten and as she lay bleeding face down on the tool shed floor, Mr. Teetson returned home. His *1226 attention was drawn to the tool shed; and, as he entered the doorway, he was struck on the back of his head by Defendant. To insure death, the Teetsons' throats were cut and a caustic solution was poured down their throats. The knife was left protruding from the wound in Mrs. Teetson's neck. When he left the crime scene, Defendant returned to where he had hidden his bike. Later, he and Mr. Robertson buried the Teetsons' rings and burned his and Mr. Roberston's bloody clothing and shoes.
During this first tape-recorded statement, Defendant also agreed to lead the investigators to the location where he had hidden the Teetsons' jewelry and had burned the bloody clothing and shoes. He further agreed to be videotaped while showing the investigators, through a "reenactment" at the crime scene, how the murders had been committed. This videotaped reenactment of the murders took place later that day.
On March 19, 1996, Defendant gave a second tape-recorded statement after having been read his Miranda rights and executing a standard rights form. During this statement, Defendant recanted a portion of his earlier statement and admitted that Mr. Robertson was not involved in the crime and that he alone committed the murders. Following this second recorded statement, Defendant hand-wrote his confession at the request of Deputy Rick Shelley.
Various pre-trial motions were filed by Defendant and the State which formed the bases for many of Defendant's assigned errors on appeal. These motions include: a motion to suppress (and supplemental motion to suppress) filed by Defendant seeking the exclusion of all of his statements and the video reenactmentdenied by the trial court; a motion in limine filed by the State seeking the exclusion of trial testimony of witnesses subpoenaed by the defense who allegedly had information regarding the details of a prior felony conviction of Deputy Valentinegranted by the trial court; pre-trial motions filed by Defendant to exclude photographs of the crime scene and victims claiming that they were gruesome, prejudicial and repetitious and to quash evidence recovered pursuant to an alleged improper search of Defendant's residencecertain photographs were ruled admissible, as well as the physical evidence found at Defendant's residence; a motion for change of venue filed by Defendant urging that, due to the extensive public awareness and media coverage of the murders and investigation, an impartial jury could not be impaneled denied by the trial court after jury selection was complete. As previously stated, these motions form the bases of several of Defendant's assigned errors and will be discussed in detail under the appropriate assignments.
The State's evidence at trial included, in pertinent part: photographs of the crime scene and victims; the knife found protruding from Mrs. Teetson's neck; the videotaped reenactment of the crime; Defendant's custodial statements; testimony of the sheriff's deputies who investigated the case and were involved in obtaining Defendant's statements; witnesses who saw Defendant after the murders had occurred; DNA testing and crime lab findings; the coroner's findings and conclusions; and the testimony of a jeweler who identified Mrs. Teetson's rings.
The physical evidence that connected Defendant to the crime included boxer shorts, which were recovered from Defendant's bedroom pursuant to a search warrant, a small plastic bottle and cap and Mrs. Teetson's rings. DNA testing revealed that blood stains on the boxer shorts were, in fact, Mrs. Teetson's. The small plastic bottle and black cap recovered from the crime scene were identified as the same items that Defendant showed *1227 to Mr. Burks the day of the murders. Mrs. Teetson's rings were located based on Defendant's statements to sheriff's deputies, described earlier, and were identified via testimony from a jeweler who recognized the rings as belonging to her. The knife was also introduced as a murder weapon.
Deputies Valentine, Shelley and Don Morgan testified regarding the statements given by Defendant. A hearing was held outside the presence of the jury pursuant to La. C.E. art. 104 to establish that the confessions were freely and voluntarily given by Defendant. Defense counsel renewed the objection to the admission of the statements which had been raised at the pre-trial hearing. Noting the objection, the trial court found that the statements were freely and voluntarily given and, therefore, admissible.
Both Mr. Robertson and Mr. Burks testified at trial. Mr. Robertson testified that Defendant approached him and some friends as they were riding go-carts on Bistineau Baptist Church Road on the evening of the murders. Defendant asked Mr. Robertson for a ride to his grandmother's house and Mr. Robertson agreed. Mr. Robertson testified that he noticed that Defendant had blood on his tennis shoes and pants; and, while en route, Defendant told him that he had killed two people and showed Mr. Robertson a wedding band and some money. Mr. Robertson denied having any involvement with the murders.
Mr. Burks testified that he and Defendant discussed and planned a robbery of the Teetsons. On the day of the murders, Defendant came by to get Mr. Burks who then told Defendant that he would not go with him because it was "wrong." Defendant asked Mr. Burks for some lighter fluid, which Defendant poured into a small, clear bottle with a black cap. The next day, Mr. Burks saw Defendant who admitted to him that "he had done it." Defendant then showed Mr. Burks money (five twenty-dollar bills). Mr. Burks also denied that he had any direct involvement with the murder of the Teetsons.
The defense presented testimony from Mrs. Coleman, Defendant's mother, regarding the instances when sheriff's deputies searched her home.[1] Her testimony was essentially that, to her knowledge, Defendant did not own a pair of boxer shorts.
In addition, the defense presented the testimony of Dr. Mark Vigen regarding Defendant's handwritten statement of March 19, 1996, who opined that the statement was likely the product of police coaching and/or that someone else dictated to Defendant what to write. The State's rebuttal included the testimony of Dr. George Seiden and Deputy Morgan. Dr. Seiden refuted a portion of Dr. Vigen's testimony in regard to the average reading comprehension level of the general population.
Finally, the Defendant presented evidence as to the lack of identifiable fingerprints at the scene of the crime. In rebuttal, the State questioned Deputy Morgan regarding the lack of fingerprints. He testified that fingerprints would not have been found at the crime scene because Defendant stated that he wore socks over his hands when he committed the murders.
As previously stated, a unanimous jury convicted Defendant on both counts of first degree murder; and, since the jury was unable to unanimously agree on the death penalty, the trial judge sentenced Defendant to the mandatory term of life imprisonment, without benefit, on each count. *1228 The sentences were ordered to be served consecutively.

DISCUSSION

Assignments of Error Nos. 19 & 20: Denial of motion for new trial & sufficiency of the evidence
Defendant argues that the trial court erred in failing to grant his motion for new trial and/or motion for post-verdict judgment of acquittal. Defendant claims that the evidence adduced at trial supports no greater offense against him than second degree murder and that his statements were erroneously admitted. The State urges that the evidence was sufficient to convict Defendant of first degree murder. We agree.
La.C.Cr.P. art. 851(1) provides that the court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence, i.e., that the evidence was insufficient to sustain the conviction. A motion for new trial presents only the issue of the weight of the evidence. Under this article, the trial judge has wide discretion to determine the weight of the evidence. The refusal to grant such a motion is not subject to appellate review, except for error of law. State v. Mitchell, 26,070 (La.App.2d Cir.6/22/94), 639 So.2d 391, writ denied, 94-1981 (La.12/16/94), 648 So.2d 387, citing Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); State v. Robinson, 624 So.2d 1260 (La.App. 2d Cir. 1993), writ denied, 93-2897 (La.2/11/94), 634 So.2d 372; State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993); State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983).
La.C.Cr.P. art. 821 provides that a motion for post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992).
When issues are raised on appeal, both as to the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal. See Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981).
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case does *1229 not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of witnesses in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App.2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
La. R.S. 14:30 provides, in pertinent part:
First degree murder is the killing of a human being:
When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery... first degree robbery, or simple robbery.
The prosecution of Defendant arose from, and rested heavily on, the statements/confessions he made to sheriff's deputies which were admitted at trial over objection. Since we find that the statements were properly admitted (see discussion of Assignment of Error No. 12, infra), we shall include them in the instant discussion. Although Defendant's fingerprints were not found at the crime scene nor recovered from any of the murder weapons, the statements of Defendant, information obtained from other persons during the investigation and a search of Defendant's residence allowed the State to link two pieces of physical evidence connected with the murders to Defendant the small, clear bottle with a black cap and the boxer shorts, which were determined to have Mrs. Teetson's blood on them. Mr. Robertson testified that Defendant admitted to him shortly after the murders occurred that he had "killed two people." Additionally, Mr. Burks testified that he had discussed and planned with Defendant to rob the Teetsons; however, on the day of the murders, Mr. Burks told Defendant he was not going with him. According to Mr. Burks, he gave Defendant a can of lighter fluid because Defendant said he wanted to "knock them out." Defendant poured some of the lighter fluid into the small, clear bottle with a black cap. Mr. Burks also testified that Defendant admitted to him a day or so after the murders that he had gone to the Teetsons' home and "done it." Furthermore, Deputies Valentine and Shelley testified that, after being advised of his Miranda rights, Defendant freely and voluntarily agreed to give the Statements made by him on March 18, 1996 (audio and video), and March 19, 1996 (audio and handwritten), wherein Defendant confessed to the murders.
The above evidence, and the record as a whole, when viewed in a light most favorable to the State, was sufficient to establish each of the elements of first degree murder. Considering the totality of the evidence presented, a rational trier of fact could have found beyond a reasonable doubt that Defendant committed first degree murder of the Teetsons. We find, therefore, that these assignments are without merit. We now address the remaining assignments of error.

Assignment of Error No. 1: Failure to grant challenge for cause
In this assignment, Defendant argues that the trial court erred in failing to grant his challenge for cause as to prospective juror Gordon Ervin; and, thus, Defendant was forced to use a peremptory challenge to exclude him.
*1230 During voir dire, Mr. Ervin stated that he was employed by the Webster Parish Police Jury as a senior administrator; and, in that capacity, he had contact with the district attorney's office. Mr. Ervin admitted to knowing Deputies Shelley, Morgan and Valentine; however, he did not know them "socially." He stated that he did not know the victims, but was aware of the case from the newspaper. Mr. Ervin also stated that he had not formed any opinion regarding the guilt or innocence of Defendant. During questioning by defense counsel, Mr. Ervin stated that he was a state commissioned peace officer with the Department of Public Safety.
The trial judge questioned Mr. Ervin regarding his employment with Webster Parish and the fact that he knew Mr. Bullers, the district attorney. Mr. Ervin candidly stated that these factors would not prevent him from being fair and impartial if chosen as a juror in the case. He also restated that, while he was a commissioned peace officer, that position is not something that he utilized in the ordinary course of his employment. Mr. Ervin further restated that he was the Webster Parish emergency preparedness director which caused him to work closely with the police department, but not on criminal matters. He also stated that he had not discussed the case with any police officers. Mr. Ervin offered that he had not made an arrest, nor "used" his commission as a peace officer since before 1965.[2]
Defense counsel timely objected when the trial court failed to grant the challenge for cause of Mr. Ervin. In support of the objection, Defendant relied on State v. Monroe, 366 So.2d 1345 (La.1978). The trial court overruled the objection and Defendant exercised a peremptory challenge to exclude Mr. Ervin from the jury. The trial judge stated that he would consider giving this peremptory challenge back to Defendant after he had an opportunity to review the applicable cases cited by defense counsel. Later in voir dire, the trial judge revisited his decision regarding Mr. Ervin and concluded that his review of the case law clearly indicated that a challenge for cause of Mr. Ervin was not appropriate and that his exclusion would stand as a peremptory challenge by Defendant. Defendant used all 12 of his peremptory challenges in selecting the jury. When the final juror, Ronald Hightower, was accepted, counsel for Defendant requested an additional peremptory challenge, which he intended to exercise to exclude Mr. Hightower. The trial court denied the request for an additional peremptory challenge and allowed Defendant to make a proffer of a completed peremptory challenge form. Mr. Hightower sat as the twelfth juror.
La.C.Cr.P. art. 797 provides, in pertinent part, as follows:
The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable *1231 to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court.
The trial judge is vested with broad discretion in ruling on challenges for cause; his ruling will be reversed only when a review of the entire voir dire reveals an abuse of discretion. State v. Butler, 30,798 (La.App. 2nd Cir.6/24/98), 714 So.2d 877, writ denied, 98-2217 (La.1/8/99), 734 So.2d 1222, citing State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683. When a defendant has exhausted all his peremptory challenges during jury selection, prejudice will be presumed if the trial court has erroneously denied a challenge for cause. State v. Butler, supra; State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320. An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Divers, supra. To obtain a reversal of his conviction and sentence, therefore, a defendant must show that: (1) the trial court erroneously denied a challenge for cause; and (2) he used all of his peremptory challenges. State v. Divers, supra.
Counsel should be permitted wide latitude in questioning prospective jurors during voir dire and the scope of the examination shall be within the sound discretion of the trial court. La. Const. art. 1, § 17; La.C.Cr.P. art. 786; State v. Allen, 380 So.2d 28 (La.1980). Even where a prospective juror's affiliations raise an issue regarding his ability to be impartial, if, after voir dire examination, the trial judge is satisfied that the prospective juror can render an impartial verdict according to the law and the evidence, it is the trial judge's duty to deny the defendant's challenge for cause. La. C.Cr.P. art. 797(2); State v. Timon, 28,747 (La.App. 2nd Cir.10/30/96), 683 So.2d 315, writ denied, 96-2880 (La.4/25/97), 692 So.2d 1081.
A juror's association with law enforcement agencies or personnel will not alone disqualify him from service. State v. Butler, supra. Such an association, however, should be closely scrutinized by the trial court and the appellate court. Id. People with prior law enforcement connections are competent to serve on a criminal jury. Id., citing State v. Henderson, 566 So.2d 1098 (La.App. 2nd Cir.1990); c.f. State v. Brown, 97-1531 (La.App. 3rd Cir.6/10/98), 715 So.2d 566, writ denied, 98-1790 (La.9/23/98), 724 So.2d 773. Additionally, the fact that a prospective juror is "friends" with, or related to, law enforcement officials or the district attorney is not grounds for automatic exclusion for cause. State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810; State v. Lee, 559 So.2d 1310 (La.1990); State v. Butler, supra; State v. Henderson, supra. When a juror has a prior or current association with law enforcement officials, the question becomes whether the juror can assess the credibility of the witnesses independent of the association. State v. Butler, supra. The trial court should examine "whether the prospective juror's position might have produced relationships or attitudes that would disqualify him as a juror." Id. The basis for disqualification should be covered during voir dire and appear in the record. Id.
We find that Defendant's reliance upon State v. Monroe, supra, is misplaced. In Monroe, the prospective juror was, at the time of jury selection, an assistant district attorney ("ADA") in the same office as the district attorneys trying the case. Despite the ADA's statements during voir dire that he could remain fair and impartial, the supreme court held that the relationship of this juror was such that bias and prejudice against the defendant could be reasonably implied and could not be overcome by voir dire statements to the contrary. In Monroe, it was reasonable to conclude that this relationship would influence *1232 the juror in arriving at a verdict. The pertinent facts of Monroe are distinguishable from those regarding Mr. Ervin in the instant case.
Defendant also cites State v. Fairley, 25,951 (La.App. 2nd Cir.5/4/94), 645 So.2d 213, writ denied, 94-1940 (La.11/11/94), 645 So.2d 1152, writ denied on rehearing, 94-2909 (La.3/24/95), 651 So.2d 287, in support of his argument that the trial court should have dismissed Mr. Ervin for cause. In the original decision in State v. Fairley, a panel of this court concluded that the trial judge erred in failing to grant a challenge for cause to a prospective juror who was the district attorney's babysitter and reversed the defendant's conviction and sentence. The babysitter admitted to working in the DA's home practically every day. The original panel in State v. Fairley also questioned the trial court's failure to exclude for cause a prospective juror who was a relative (first cousin) of the assistant district attorney involved in the trial of the case. On rehearing, however, a different panel of this court departed from the original ruling and upheld the defendant's conviction and sentence. The original decision regarding the babysitter was in error because the jury was selected from individuals who preceded her in the jury pool. We also found no error in the trial court's refusal to grant a challenge for cause as to the juror/first cousin where there was no indication in the record regarding the extent or closeness of the relationship between the ADA and this juror. We find no support for Defendant's argument in the holding in State v. Fairley.
None of the responses provided by Mr. Ervin were such that one could reasonably imply bias or prejudice on his part against Defendant. He stated that he could be a fair juror despite his acquaintances with law enforcement officials and District Attorney Bullers. He was not currently, nor was it clear that he ever had been, employed as a law enforcement officer. Neither his employment by Webster Parish alone, his status as a state commissioned peace officer nor his answers during voir dire warranted a challenge for cause under La.C.Cr.P. art. 797. The trial court did not commit reversible error in failing to grant Defendant's challenge for cause to Mr. Ervin.

Assignment of Error No. 2: Batson challenge to three prospective jurors
By this assignment of error, Defendant challenges the State's exercise of peremptory challenges excusing three prospective African-American jurors, specifically Mamie Brooks, Amanda Barnes and Oliver G. Kinsey. Defendant contends that the trial court erred in allowing the peremptory challenges over his objections pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We find no error in the trial court's rulings regarding these three prospective jurors.
The trial court held a Batson hearing in regard to each of the above named prospective jurors. The first African-American juror the State sought to excuse under a peremptory challenge was Mamie Brooks. This was the first peremptory challenge that the State had made during jury selection. The trial court concluded that Defendant had failed to make a prima facie showing that the State was exercising its peremptory challenges to exclude a juror on the basis of race. Nevertheless, the trial court asked the district attorney to state his reasons for excluding Ms. Brooks as a juror.
The second African-American prospective juror excused under a peremptory challenge by the State was Oliver G. Kinsey. Initially, the State sought to excuse Mr. Kinsey for cause because of his "conscientious objections to the death penalty." Defendant argued that Mr. Kinsey's view on capital punishment did not meet the criteria for exclusion for cause as set forth in Wainwright v. Witt, 469 U.S. 412, 105 *1233 S.Ct. 844, 83 L.Ed.2d 841 (1985). Following the trial court's questioning of Mr. Kinsey, the State withdrew its challenge for cause and exercised a peremptory challenge to exclude him. The defense made a Batson objection.
In ruling on the challenge to Mr. Kinsey, the trial court noted that, at that point, the State had used three peremptory challenges, two against white prospective jurors and one against Mamie Brooks. Under these circumstances, the trial court ruled that Defendant had failed to make a prima facie showing that the State was exercising its peremptory challenges to exclude African-Americans from the jury. The trial court also noted that the State's voir dire questions did not raise an inference that the peremptory strikes are motivated by impermissible considerations. Again, the trial court asked the district attorney to state his reasons in support of the challenge to Mr. Kinsey to complete the record for appellate purposes.
The third prospective African-American juror that the State excused by peremptory challenge was Amanda Barnes. Defendant stated a Batson objection to the exclusion of Ms. Barnes. The State argued that it had, at that point, used four peremptory challenges, two against prospective white jurors and two against prospective African-American jurors, which revealed no pattern of peremptory strikes based on the jurors' race. The defense argued that the district attorney's questions regarding the biological fathers of Ms. Barnes' children raised an inference that his exclusion of her was motivated by impermissible considerations. The district attorney responded that he was attempting to determine who else lived in Ms. Barnes' household and to determine the stability of her home life.
Again, the trial court ruled that Defendant had failed to make a prima facie showing that a pattern existed in the State's use of its peremptory challenges to exclude African-American jurors. As with Ms. Brooks and Mr. Kinsey, the trial court requested that the district attorney articulate racially-neutral reasons in support of his peremptory challenge to Ms. Barnes.
The Batson holding is codified in our law as La.C.Cr.P. art. 795(C), which provides:
C. No peremptory challenge made by the state or defendant shall be based solely upon the race of the juror. If an objection is made that the state or the defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
To make a Batson claim against the State, Defendant must first establish a prima facie case that the State exercised its peremptory challenges to exclude members of the jury venire solely on the basis of their cognizable race. Batson, supra; State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272; State v. Jackson, 29,470 (La.App.2d Cir.8/20/97), 707 So.2d 990. The State need not give an explanation for its use of a peremptory challenge if the trial court does not find that the defense has made a prima facie case. Many trial courts do so, however, as did the trial court in this case, in order to create a complete record. State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992).
The trial court, advantaged by observing the characteristics and demeanor of the lawyers and prospective jurors, is in the best position for deciding if a discriminatory objective underlies peremptory *1234 challenges. State v. Jackson, supra; See State v. Banks, 96-652 (La.App. 5th Cir.1/15/97), 694 So.2d 401. Thus, the conclusions of the trial court merit great deference. State v. Jackson, supra; State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir. 1991), writ denied, 594 So.2d 1317 (La. 1992), and authorities cited therein.
A review of the instant voir dire as a whole reveals that the trial court did not err in finding that Defendant had failed to establish a prima facie case as required by Batson and its progeny. We find that the peremptory challenges exercised by the State to the prospective jurors in this case reveal no pattern of challenges for discriminatory reasons. Since we agree with the trial court that Defendant failed to make a prima facie showing of a pattern of peremptory strikes based on the juror's race, our analysis need not go further. State v. Rose, supra.[3]

Assignment of Error No. 5: Motion for change of venue
As previously stated, Defendant filed a pre-trial motion for change of venue arguing that the media coverage and publicity surrounding this crime in Webster Parish necessitated a change of venue to insure that he was tried by a fair and impartial jury. In support of his motion, Defendant submitted 11 newspaper articles dealing with the case and the alleged evidence against him. The majority of the articles were dated March or April 1996, almost three years before the jury selection. The trial court and counsel agreed that a ruling on the motion was not appropriate until jury selection.
On February 19, 1999, after four days of jury selection and 12 jurors having been selected, the trial court denied the motion stating:
In preparation on ruling on this motion, the Court has reviewed several cases, but specifically State of Louisiana versus Tracy Lee, which is a Louisiana Supreme Court case, appearing at 559 So.2d 1310, and State of Louisiana versus Connolly, which is a Louisiana Supreme Court case, appearing at 700 So.2d 810, and particularly in the Connolly case, which is a 1997 case, and that particular case eighty-six percent of prospective jurors were aware of the murder prior to trial and the vast majority had read or had some vague recollection of the basic facts surrounding the crime. And the Court stated that the defendant is not entitled to a jury that is entirely ignorant of the case and goes on to rule that in that case that a change of venue was not warranted, the results were the same in the State of Louisiana versus Tracy Lee, and given the response of the prospective jurors during voir dire in this case the court concludes that change of venue is not warranted. The change of venue will be not granted.
Earlier during voir dire, the trial court commented that "quite a few" prospective *1235 jurors had little or no knowledge of the case. Defense counsel failed to point out any specific prospective or selected jurors whose knowledge or familiarity with the case had so tainted his or her judgment that they could not be fair and impartial.
La.C.Cr.P. art. 622 states:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
The trial court is given much discretion in granting or denying a motion for change of venue. State v. Timon, supra. The defendant carries the burden of showing that there is more than just public knowledge of the facts surrounding the offense. Id. The defendant must show a "prevalent community-wide prejudice" that makes a fair trial in that parish impossible. Id. Media coverage alone does not warrant change of venue in a criminal trial unless the "trial atmosphere has been utterly corrupted by press coverage." State v. Lee, supra, citing State v. Clark, 442 So.2d 1129 (La.1983); and State v. Morris, 429 So.2d 111 (La.1983). A defendant is not entitled to a jury that is entirely ignorant of his case. State v. Connolly, supra.
Following its review of the entire voir dire, the court in State v. Connolly, supra, stated its findings, which are applicable to the voir dire in the instant case:
Each prospective juror was questioned individually concerning their knowledge of the events surrounding the crime and their opinions concerning Defendant's guilt or innocence. Most of the prospective jurors stated they had not yet formed a definite opinion concerning Defendant's guilt or innocence, and would hear all of the evidence before rendering a decision. Furthermore, we note that any juror who had extensive knowledge of the facts of the crime and had already made a decision concerning Defendant's guilt or innocence was excused for cause. On the whole, a review of the prospective juror's responses does not reveal a prejudice existing in the minds of the community from which the venire was selected to support a conclusion that Defendant was denied a fair and impartial trial.
The record in the case sub judice reflects that the trial court appropriately exercised its discretion by questioning prospective jurors, where necessary, to determine their knowledge of and familiarity with the case and/or the victims and witnesses. In fact, in one instance, the trial court noted that it would grant a challenge for cause "out of an abundance of caution" where the prospective juror indicated he had known Mrs. Teetson since his childhood. As a whole, the comments made by the prospective jurors do not reflect a community prejudice against Defendant. We can find no evidence in this record that would indicate that Defendant was denied his constitutional right to a fair and impartial jury.
We conclude, therefore, that the denial of Defendant's motion for change of venue was not an abuse of discretion. Accordingly, this assignment of error lacks merit.

Assignments of Error Nos. 6 & 13: Admissibility of photographs & knife
In these assignments, Defendant argues that the admission of State Exhibits 1 through 6 and the knife, Exhibit 27, was error. Defendant contends that the photos of the crime scene and the victims *1236 are gruesome and more prejudicial than probative. State Exhibits 1 and 2 show the hatch of the Teetsons' van open under the carport. State Exhibit 3 shows a trail of blood from the driveway area into the Teetsons' tool shed. State Exhibits 4, 5 and 6 show bloody footprints and the Teetsons' bodies on the concrete floor of the shed. Exhibit 6 is a close-up view of Mrs. Teetson showing the knife protruding from the wound in her neck.
Defendant claims that, in particular, State Exhibit 6 and the knife were used to inflame the jury. The State responds that the photographs were necessary to refute Defendant's initial claim that two assailants committed this crime and that he took no part in the murders. State Exhibit 6 and the knife were relevant to corroborate Defendant's earlier custodial statement regarding the knife as a murder weapon.
State's witness Reverend Wayne Whiteside discovered the Teetsons' bodies at approximately 8:00 p.m. the day after the murders occurred. Reverend Whiteside testified that the photographs, State Exhibits 1 through 6, depicted the crime scene and victims as they were when he arrived at the Teetsons' home. The State offered the photographs into evidence and asked to show them to the jury. After a bench conference, the trial court noted for the record that the defense objected to the introduction of the photographs. The trial court had previously ruled on Defendant's pre-trial motion to suppress the photographs and knife wherein, after reviewing all of the photographs sought to be introduced by the State, it had selected the photographs which could be introduced at trial and suppressed those which it found to be repetitious, cumulative and, therefore, inadmissible.
Generally, photographs are admissible in a criminal proceeding "if they illustrate any fact, shed light on any issue in the case, or are relevant to describe the person, thing or place depicted." State v. Washington, 30,866 (La.App. 2nd Cir.8/19/98), 716 So.2d 936, writ denied, 98-2473 (La.1/8/99), 734 So.2d 1229. Unless their probative value is substantially outweighed by the prejudicial effect, admission of photographs will not be reversible error, even if the photographs could be viewed as gruesome. State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250, cert. den., 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538; State v. Washington, supra; State v. Gay, 29,434 (La.App. 2nd Cir.6/18/97), 697 So.2d 642. The trial court has great discretion in admitting photographs into evidence and, absent an abuse of that discretion, the ruling will not be disturbed. State v. Gay, supra. In addition, the trial court has discretion regarding the admission of physical evidence. State v. Taylor, 30,310 (La.App. 2nd Cir.2/25/98), 709 So.2d 883; State v. Myers, 583 So.2d 67 (La.App. 2nd Cir.1991), writ denied, 585 So.2d 576 (La.1991); La. C.E. art. 103.
In his pre-trial motion to suppress the photographs and knife, Defendant argued that this crime was committed by two assailants and that his statements were inaccurate and made only as the result of police coercion. The photographs, however, show only one set of footprints and details that are, in many respects, consistent with the statements given by Defendant. Thus, the photographs assisted the jury in resolving the issues raised by the defense. Each of the photographs and the knife, as a murder weapon, had relevance and significant probative value. This evidence was not so gruesome as to overwhelm the jurors' reason. As previously stated, we find it significant that, before ruling on the motion to suppress, the trial judge reviewed all of the photographs in this case and was selective in his ruling regarding which of the photographs the State would be allowed to introduce at *1237 trial. We conclude, therefore, that the trial judge did not abuse his discretion in admitting this evidence over Defendant's objection.

Assignment of Error No. 7: Admissibility of the videotaped "reenactment"
Defendant contends that the trial court erred in failing to grant his pre-trial motion to exclude the March 18, 1996 videotape of Defendant wherein he leads sheriff's deputies to evidence, then "re-enacts" the crime at the Teetons' residence. In addition to claiming that the statements by Defendant on the videotape were not freely and voluntarily given, Defendant claims that the contents of the videotape had no probative value in this prosecution, did not depict the parties in an identical or similar manner to the actual events surrounding this crime and was misleading to the jury. Defendant also objects to the narration or comments by the deputies which are included on the audio portion of the videotape. The State responds that the videotape is a confession by Defendant and is, therefore, very probative. Further, the State emphasizes that a viewing of the videotape clearly indicates that the filming was under the direction of Defendant as he told police officers where to go and what had occurred. We will first address the admissibility of the videotape as a confession or reenactment of the crime and will then discuss the admission of the narrative comments made by persons other than Defendant.
In support of his claim that the videotape as "reconstructed evidence" is inadmissible, Defendant relies upon State v. Trahan, 576 So.2d 1 (La.1990). In State v. Trahan, supra, the supreme court held that a videotaped reenactment made by actors portraying the defendant and the victim was properly excluded by the trial court. The trial court correctly concluded that the reenactment had no probative value because it did not accurately depict the condition or position of the parties during the shooting that occurred in the victim's car. The videotaped reenactment in State v. Trahan, supra, was offered by the defense to rebut the testimony of the State's expert witness, but was in contrast to Defendant's trial testimony. Additionally, and a fact we find to be significant, the videotaped reenactment in State v. Trahan did not include the participation of the defendant.
In the case sub judice, we agree with the trial judge that, in contrast to the facts in State v. Trahan, the videotape of Defendant is but an extension of his statement and confession to sheriffs deputies on March 18, 1996. Instead of verbally telling the deputies where he hid or destroyed evidence relating to the crime, he showed them. Instead of verbally telling how the murders were committed, Defendant visually showed them what occurred. Before ruling on the motion to suppress, the trial judge viewed the videotape twice; and, in his various comments throughout the hearing, he emphasized the voluntary nature of Defendant's behavior and mannerisms on the videotape. Our viewing of the videotape supports that conclusion as well.
As a re-creation of the crime, moreover, the reenactment need not be exact in every detail. State v. Trahan, supra. In order to have probative value, the scene depicted must be very similar to that which existed when the crime occurred. Id., citing State v. Boyer, 406 So.2d 143 (La.1981). A review of the subject videotape shows that the scene inside the Teetsons' home and the tool shed had changed very little since the murders occurred. At least twice during the videotaping, Defendant points out slight differences (arrangement of items in kitchen and tool shed door changed) while explaining how this crime was committed. Defendant, without provocation, details where he and his alleged accomplice were standing *1238 when Mrs. Teetson, and then Mr. Teetson, were both struck down and beaten. It is apparent that Defendant is directing the reenactment, not the sheriff's deputies. Furthermore, Deputy Kenny Stewart, who was operating the videotape recorder, testified unequivocally at the hearing on the motion to suppress that he was following the direction of Defendant and no one else. We conclude, therefore, that, whether viewed as an extension of Defendant's earlier tape-recorded confession or as a "reenactment" of the crimes, the videotape was properly admitted.
Next, Defendant challenges as hearsay evidence the admission of the narrative comments made by persons other than himself which are audible on the videotape. While, arguably, the admission of these out-of-court statements was error, we find that any such error was harmless. In State v. Harris, 627 So.2d 788 (La.App. 2nd Cir.1993), this court recognized that, when hearsay evidence is improperly admitted at trial, the reviewing court must determine whether the evidence contributed to the verdict. If the inadmissible hearsay evidence is merely cumulative or corroborative of other testimony adduced at trial, its admission is considered harmless. State v. Harris, supra. The three sheriffs deputies primarily involved in the videotapingDeputies Valentine, Morgan and Stewarttestified at trial and were subject to cross-examination by the defense. The majority of the narration on the videotape is from Deputy Stewart who, as previously stated, was operating the videotape recorder. Again, Deputy Stewart testified that the statements he made during the videotaping were merely to repeat and record what was said by Defendant. Additionally, our review of the audio portion of the videotape reveals, for example, that, at the scene of the burning of Defendant's clothes, Defendant offered unsolicited information regarding the burning of the clothes and responded to questions posed by Deputy Stewart who, in turn, simply restates Defendant's responses in order to insure their recordation on the videotape. As such, we find any error in admitting the narrative comments of persons other than Defendant to be harmless; and, therefore, we find no merit in this assignment.

Assignments of Error Nos. 9 & 11: Admissibility of boxer shorts & limiting cross-examination
In these assignments, Defendant argues that the boxer shorts seized from his home pursuant to a search warrant were not admissible. Defendant further contends that the trial court erred by allowing Deputy Morgan to testify regarding the results of crime lab testing of stains on the boxer shorts. Finally, Defendant claims that the trial court erred in limiting the cross-examination of Deputy Morgan regarding the contents of the search warrant affidavit.
The trial judge denied Defendant's pre-trial motion to suppress the boxer shorts as evidence finding they had been seized pursuant to a valid search warrant. On appeal, Defendant focuses on the trial testimony of Deputy Morgan regarding the crime lab report results of the DNA testing on the boxer shorts. During his testimony, Deputy Morgan identified the boxer shorts as the pair he recovered from Defendant's clothes hamper in his bedroom. Deputy Morgan further testified that he had submitted the boxer shorts to the crime lab for DNA analysis of the blood splatters on the shorts. Deputy Morgan was then asked if he knew the results of the crime lab testing as reflected in a report contained in his file. His response was that the crime lab results revealed Mrs. Teetson's blood on the boxer shorts. Deputy Morgan's testimony was from his personal knowledge and direct participation in the investigation of this *1239 case. He was not asked technical or scientific questions.
In response to Defendant's objection, the State indicated that it intended to call a representative from the crime lab to explain and verify the testing and results. We conclude that the trial court did not err in allowing this direct testimony by Deputy Morgan.
Additionally, Pat Wojtkiewicz, accepted by the court as an expert in DNA analysis, testified for the State.[4] Mr. Wojtkiewicz identified the spots on the boxer shorts as human blood and further testified that, within a very high range of probability, the blood was Mrs. Teetson's. We find, therefore, that, even if error had occurred in the admission of the testimony of Deputy Morgan regarding the results of the DNA testing, it was harmless in light of the testimony of Mr. Wojtkiewicz.
In regard to Defendant's attempted cross-examination of Deputy Morgan about the search warrant affidavit, the trial court correctly ruled that the affidavit contained inadmissable hearsay. State v. Bass, 595 So.2d 820 (La.App. 2nd Cir. 1992), writ denied, 598 So.2d 373 (La. 1992); State v. White, 559 So.2d 541 (La. App. 2nd Cir.1990); State v. Edwards, 569 So.2d 597 (La.App. 2nd Cir.1990), writ denied, 576 So.2d 29 (La.1991).
These assignments of error have no merit.

Assignment of Error No. 10: Erroneous admission of hearsay evidence
Defendant claims that the trial court erred by admitting hearsay evidence during the testimony of Deputy Morgan. Specifically, Defendant claims that his objection to Deputy Morgan's testimony about Mr. Robertson's alibi should have been sustained and the jury admonished to disregard this testimony.
On direct examination by the State, Deputy Morgan was questioned regarding his investigation of the alleged involvement of Mr. Robertson in the Teetson murders. He responded as follows:
We learned that through the course of investigation. The day of the murder he has three other witnesses to count [sic] for his whereabouts, where he was at the approximate time of the murders.
Defense counsel objected "to any hearsay." A bench conference was held during which defense counsel asked the trial court to instruct the jury to disregard what three other witnesses may have said in regard to Mr. Robertson; however, the trial court declined to admonish the jury at that time. Later in the trial, Mr. Robertson testified and was questioned regarding his whereabouts on the day of the murders.
Contrary to Defendant's argument, the above-quoted testimony of Deputy Morgan does not contain hearsay. This testimony does not include a "statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801. The State correctly argues that Deputy Morgan was testifying as to the results of his investigation. Furthermore, because Mr. Robertson testified at trial regarding his alibi, the testimony of Deputy Morgan is merely cumulative of other testimony adduced at trial. Even assuming, therefore, that Deputy Morgan's testimony contained hearsay and was improperly admitted, any error is considered harmless. State v. Harris, supra.

Assignment of Error No. 12: Denial of Motions to Suppress
In this assignment, Defendant argues that the trial court erred in denying *1240 his pre-trial motion to suppress the statements made by him to sheriff's deputies on March 18 and March 19, 1996. Defendant also claims that the trial judge erred when he concluded, after a hearing held pursuant to La. C.E. art. 104(C) and La. R.S. 15:451, that Defendant's statements were freely and voluntarily given after he had been fully advised of his Miranda rights. The State maintains, and we agree, that Defendant's statements were properly admitted and were not the product of any fear, duress, intimidation, coercion or threats by the deputies.
On May 16, 1996, Defendant filed a motion to suppress evidence and a supplemental motion to suppress evidence, both concerning the custodial statements Defendant had given sheriff's deputies. Defendant's motions to suppress were heard on August 3, 4 and 5, 1998. In the motions, Defendant claimed that he was initially taken into custody under the pretext of a two-year-old traffic warrant, but was actually wanted for the purpose of interrogation regarding the Teetson murders. Defendant now argues that, after the sheriff's deputies took him into their custody, he was not advised of his Miranda rights and was interrogated without a waiver of his constitutional rights. Defendant claims that he asserted his right to remain silent and asked to speak with an attorney, but that the deputies continued to question him.
In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion but also may consider pertinent evidence given at trial. State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993). At a hearing on a motion to suppress a confession the State bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Rogers, 476 So.2d 942 (La.App. 2d Cir.1985). It is the State's burden to prove the admissibility of any evidence seized without a warrant. La.C.Cr.P. art. 703(D); State v. Traylor, 31,378 (La.App.2d Cir.12/9/98), 723 So.2d 497.
The admissibility of a confession is in the first instance a question for the trial judge. His conclusion on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility will not be overturned on appeal unless not supported by the evidence. State v. Dailey, 607 So.2d 904 (La.App.2d Cir.1992), citing State v. Benoit, 440 So.2d 129 (La.1983); and State v. Jackson, 381 So.2d 485 (La.1980). We place great weight upon the trial court's factual determinations because of that court's opportunity to observe witnesses and assess credibility. State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082.
At the hearing on the motions to suppress, Defendant testified that he was arrested for an unpaid traffic ticket. According to Defendant, the following events took place after he was taken into custody. While Defendant was in jail, sheriff's deputies approached him and asked whether he wanted to talk to them. He responded that he "didn't have nothing to say." Thereafter, "everybody" kept coming by his jail cell telling him that he "was going to fry" and that he had committed murder. After six days in jail, Defendant was taken by Deputy Morgan to a room where Deputy Valentine was waiting. Deputy Valentine insisted that Defendant tell him how he had committed the murders. Defendant further testified that he denied killing anyone and asked to speak to a lawyer. When Defendant did not cooperate, he was taken back to his jail cell.
The next day, according to Defendant, Deputy Valentine interrogated him a second time; and Defendant again asked to *1241 speak to a lawyer. Deputy Valentine took the business card of attorney Peter Flowers from Defendant's wallet. When Defendant continued to insist that he knew nothing of the murders, Deputy Valentine struck Defendant's left jaw with a newspaper. Defendant also testified that there was a knife in the room that he recognized as belonging to his father. According to Defendant, when he looked at the knife, Deputy Valentine drew his gun, pointed it in Defendant's face and threatened to shoot him. Defendant testified that, at this point, he began to cry. Deputy Valentine, however, continued to prod Defendant telling him that the district attorney's office would "help" him if Defendant cooperated. Deputy Valentine then asked Defendant to sign some "papers." Defendant, however, did not understand the "papers" and refused to sign them. Deputy Valentine then burned him with a cigarette and threatened to burn him a second time. In fear of further abuse, Defendant signed the "papers" and wrote what Deputy Valentine told him to add to the document[5]. Implicit in Defendant's above-described testimony is the contention that he and Deputy Valentine were alone together during the questioning when the alleged abuse and coercion occurred. Defendant also argues that, during the videotaping which took place later that day, Deputy Valentine told Defendant what to say and do.
As previously stated, in further support of the motions to suppress, Defendant offered the testimony of expert psychologist, Dr. Vigen who testified regarding Defendant's diminished reading comprehension and writing abilities. In summary, Dr. Vigen testified that Defendant would have had difficulty understanding some of the content of the voluntary statement/advice of rights form.
Charles Brooks also testified on behalf of Defendant. Mr. Brooks, a convicted felon, testified regarding how he had been tortured and coerced by Deputy Valentine while in custody following Mr. Brooks' arrest in 1988.
The State's witnesses included Deputies Valentine and Shelley. The testimony of the deputies differs dramatically from that of Defendant with respect to the circumstances surrounding the questioning of Defendant and recording of his statements. Both Deputies Valentine and Shelley testified that, after being fully advised of his Miranda rights, Defendant waived his rights and agreed to give the deputies a statement regarding his involvement in the Teetson murders. The two voluntary statement/advice of rights forms signed by Defendant on March 18 and March 19, 1996, were admitted at trial.
The deputies further testified that, at no time during the questioning or during the videotape recording, did Defendant request that the interview or videotaping terminate. Deputies Morgan and Shelley testified that they were assigned to assist Deputy Valentine in the investigation and at no time was Deputy Valentine left alone with Defendant. In addition, all of the deputies testified that at no time was Defendant subjected to any mistreatment, threats or coercion. Deputy Valentine categorically denied physically touching Defendant or otherwise mistreating him in any manner.
During his trial testimony, Deputy Shelley admitted that, at one point during the audiotaped statement on March 19, 1996, Defendant turned off the tape recorder. It is evident from the audio tapes that the recorder was turned off on at least two occasions during questioning. There is no evidence, however, that would indicate that the breaks in recording are in any way related to requests by Defendant to terminate the interview.
Following the pre-trial hearing, the trial judge ruled that Defendant's statements, *1242 including the videotape, were admissible at trial. In his oral reasons at the time of ruling, the trial judge found that the audio and videotapes clearly revealed a defendant at ease, unafraid and acting of his own volition. In his subsequent written reasons in support of his ruling, the trial judge stated:
The most telling factor in the entire testimony concerning the Motion to Suppress is the mannerisms and body english of the defendant, as reflected by the videotape placed into evidence. Deputy Valentine appears to be in an avuncular relationship with the defendant, who himself seems quite relaxed and cooperative. Mr. Coleman is not disheveled, nor is he frightened. He is all business, quite matter-of fact, and obviously talking freely and voluntarily. No coercion was proven by any credible evidence. The statements of the defendant are clearly admissible, beyond a reasonable doubt.
Clearly, the trial judge found that Defendant's testimony at the pre-trial hearing lacked credibility when compared to the voluntary statement forms he signed and his audiotaped and videotaped statements. Since the credibility of witnesses plays a key role in the determination of voluntariness, a reviewing court will defer to the ruling of the trial court in such matters unless that ruling is not supported by reliable evidence. State v. Tolbert, 30,821 (La.App. 2nd Cir.8/19/98), 716 So.2d 949, writ denied, 98-2562 (La.1/15/99), 736 So.2d 207, citing State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Green, supra; State v. Thomas, 28,790 (La.App. 2nd Cir.10/30/96), 683 So.2d 1272, writ denied, 96-2844 (La.4/25/97), 692 So.2d 1081.
After careful review of the entire record, we find no error in the trial court's conclusion that the State proved beyond a reasonable doubt that the statements were freely and voluntary made by Defendant and were not induced or procured by fear, duress, intimidation, menace, threats, inducements or promises. This assignment is without merit.

Assignment of Error No. 14: Inadmissibility of details of Deputy Valentine's prior conviction
Defendant argues that the trial court erred in limiting cross-examination of Deputy Valentine regarding the details that led to his federal court conviction on a charge of conspiracy to threaten and intimidate persons under arrest. Defendant claims that this erroneous ruling violated his Sixth Amendment right to confront witnesses against him. The State argues that La. C.E. art. 609.1 precludes such cross-examination once Deputy Valentine admitted that he had been convicted and testified to the conviction date and the sentence imposed. We agree.
During defense counsel's cross-examination of Deputy Valentine at the hearing on Defendant's pre-trial motion to suppress his statements, Deputy Valentine was questioned about his 1978 conviction. Deputy Valentine admitted that he had been convicted and had been sentenced to ten years imprisonment.[6] When defense counsel asked about the factual details that led to the conviction, the State objected. Over the objection, the trial judge allowed the questioning to continue "for a limited time" because of the specific factual allegations made in Defendant's motion to suppress. Deputy Valentine testified that he was not directly involved in the torture of suspects, but was only present when another officer used an electrical wire to *1243 obtain a confession. As defense counsel pursued this line of questioning, the State again objected. Remarking that this line of questioning had gone "far enough," the trial judge sustained the objection.
As trial drew closer, the State became aware that the defense had issued subpoenas for the trial testimony of individuals with information or knowledge regarding the factual details that led to Deputy Valentine's 1978 conviction. The State filed a motion in limine to exclude this evidence. A hearing on the State's motion was held on October 30, 1998. The defense argued that Deputy Valentine testified to exculpatory facts at the motion to suppress hearing; and, therefore, La. C.E. art. 609.1(C)(2) allowed details of the offense to be admitted. The State countered that Deputy Valentine did not testify to exculpatory facts and fully admitted to his conviction and sentence. The trial court granted the State's motion after hearing argument of counsel and reviewing the transcript of Deputy Valentine's testimony at the motion to suppress hearing. In written reasons in support of the ruling, the trial judge stated:
The Court granted the Prosecution's Motion in Limine regarding the alleged brutality 22 years ago in which Deputy Valentine was involved. The reasoning was and is that: (1) This line of inquiry is irrelevant, since the Court is convinced beyond a reasonable doubt that the statements of Kevin Coleman in 1996 were freely and voluntarily made, after a knowledgeable waiver of rights, regardless of what might have happened in 1976; (2) This "O.J. defense" would likely add a week to a sequestered jury trial, without producing more than a modicum of probative value; and (3) To allow this "red herring" would likely confuse the trier of fact, without adding any probative gravamen whatsoever to the deadly serious mix of issues at hand.
As previously stated, Defendant filed for writ review to this court. The writ was granted and made peremptory in a November 25, 1998 order. A panel of this court disagreed with the trial judge's ruling, but stated that the admissibility of "detail evidence" under La. C.E. art. 609.1(C)(2) was dependent upon the trial testimony of Deputy Valentine:
At the trial, depending on Deputy Valentine's responses to questions, and considering the above cited cases and La. C.E. art. 609(C)(2), the trial court may enter an appropriate order permitting or disallowing further inquiry into the details of Deputy Valentine's previous conviction.
At trial, Deputy Valentine admitted on direct examination his conviction, the date thereof and the resulting sentence. Before cross-examining Deputy Valentine, defense counsel offered into evidence, as Defendant's Exhibit 1, a copy of the Federal Court judgment of conviction and probation commitment order. The exhibit was admitted and shown to the jury. Thereafter, during cross-examination, defense counsel attempted to question Deputy Valentine regarding his sentence and the factual details that led to his conviction. The State objected, arguing that questions regarding Deputy Valentine's sentence were repetitive in light of his testimony on direct examination and the admission and the jury's review of Defendant's Exhibit 1. On this occasion, the defense relied on La. C.E. art. 609.1(C)(3), arguing that the factual details of Deputy Valentine's offense were admissible through testimony and/or exhibits. The trial judge rejected this argument and, after accepting a proffer of the proposed evidence from the defense, quoted the above language from the writ granted by this court and disallowed the questioning to continue.
A defendant's Sixth Amendment right to present a defense is not absolute. Roussell v. Jeane, 842 F.2d 1512 *1244 (5th Cir.1988). The right to present witnesses may be limited to accommodate "other legitimate interests in the criminal trial process." Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). For example, a defendant is not entitled to present evidence which is cumulative or immaterial. Roussell v. Jeane, supra. The trial court is vested with much discretion in controlling the scope and extent of cross-examination and its rulings will not be disturbed absent a finding of abuse of that discretion. State v. Bailey, 97-302 (La.App. 5th Cir.4/28/98), 713 So.2d 588, writ denied, 98-1458 (La.10/30/98), 723 So.2d 971.
La. C.E. art. 609.1(C) states:
C. Details of convictions. Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense:
(1) When the witness has denied the conviction or denied recollection thereof;
(2) When the witness has testified to exculpatory facts or circumstances surrounding the conviction; or
(3) When the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury.
In State v. Bailey, supra, the defendant argued that the trial court erred by refusing to allow him to cross-examine the State's key witness regarding the details of her prior conviction. The trial court ruled that the defense could cross-examine the State's witness with respect to the fact of conviction, the date thereof and the sentence imposed. Under La. C.E. art. 609.1, however, the defense could not question the witness about the "specific acts" surrounding the offense committed by the witness. With little analysis or reasoning, the fifth circuit held that the trial court rulings were in accord with La. C.E. art. 609.1. See also, State v. Wilcoxon, 26,126 (La.App. 2nd Cir.6/22/94), 639 So.2d 385, writ denied, 94-1961 (La.12/16/94), 648 So.2d 386; State v. Mays, 612 So.2d 1040 (La.App. 2nd Cir.1993), writ denied, 619 So.2d 576 (La.1993); and State v. Schexnayder, 96-98 (La.App. 5th Cir.11/26/96), 685 So.2d 357, writ denied, 97-0067 (La.5/16/97), 693 So.2d 796, cert. denied, 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67.
In State v. Powell, 28,788 (La.App. 2nd Cir.11/1/96), 683 So.2d 1281, writ denied, 97-0092 (La.5/30/97), 694 So.2d 243, this court held:
... that the third exception of Article 609.1(C) allows cross-examination into the details of the prior conviction only where the issue of the witness' credibility is raised and the details of the prior conviction are probative in impeaching his testimony and not outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.
In the instant case, it is apparent that the defense was seeking to impeach Deputy Valentine's credibility. In addition, defense counsel admitted that his intent was to inform the jury of Deputy Valentine's prior "bad acts" to show that his conduct was the same or similar with Defendant. The trial court correctly pointed out that such evidence is not admissible pursuant to La. C.E. art. 404(B).[7] Defense counsel then requested permission of the trial court to cross-examine Deputy Valentine *1245 regarding his testimony at the pre-trial hearing on Defendant's motion to suppress. The trial court recognized this to be nothing more than a "back door" attempt to delve into the factual details surrounding Deputy Valentine's conviction. The trial court, however, did not address the admissibility of the evidence under art. 609.1(C)(3).
According to the reasoning in State v. Powell, supra, La. C.E. art. 609.1(C)(3) requires the trial court to balance how probative or relevant the evidence is to the witness' credibility. It is apparent from this record that the trial court failed to consider the probative value of what the defense considered to be a substantial attack on the credibility of one of the State's key witnesses. Even assuming error in the trial court's failure to consider the admissibility of this evidence under La. C.E. art. 609.1(C)(3), however, we find that any such error was harmless. Confrontation errors are subject to harmless error analysis. State v. Butler, 30,798 (La.App. 2nd Cir.6/24/98), 714 So.2d 877, writ denied, 98-2217 (La.1/8/99), 734 So.2d 1222, citing Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).
The trial judge, who had the benefit of hearing the extensive testimony offered at the motion to suppress Defendant's statements, correctly concluded that, under La. C.E. art. 404(B), the probative value of this line of questioning did not outweigh the very real likelihood that it would confuse the issues and mislead the jury. In addition, Deputy Valentine's testimony regarding the voluntariness of the statements made by Defendant was cumulative of other evidence admitted at trial, including the testimony of Deputies Shelley, Stewart and Morgan. Also, days before his custodial statements, Defendant, on two separate occasions, admitted that he had committed the murders. First, in a conversation with Mr. Robertson, then to Mr. Burks. The overwhelming evidence presented by the State was sufficient to refute Defendant's claim that he did not commit this crime. Even if the exclusion of this testimony by Deputy Valentine was error, such error was harmless beyond a reasonable doubt.
Accordingly, this assignment of error lacks merit.

Assignment of Error No. 15: Qualification of the State's DNA expert
In this assignment, Defendant argues that the trial court improperly found that Mr. Wojtkiewicz was qualified to give expert testimony in the field of DNA analysis. In support of his argument, Defendant points out that Mr. Wojtkiewicz was not "certified" in DNA analysis. The State argues that Mr. Wojtkiewicz's knowledge, experience, training and education met the criteria for his qualification under La. C.E. art. 702.
The trial court is vested with wide discretion in determining the competence of an expert witness, and its ruling on the qualification of the witness will not be disturbed absent an abuse of discretion. State v. Trahan, supra. In reviewing the decision of the trial court, it is important to note whether the witness has previously qualified as an expert. State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865. An expert is one who, usually by education or experience, has a unique knowledge of the subject matter at issue and he or she is permitted to express personal opinions. Barrett v. T.L. James & Co., 28,170 (La. App. 2nd Cir.4/3/96), 671 So.2d 1186, writ denied, 96-1124 (La.6/7/96), 674 So.2d 973. DNA testing and analysis is generally admissible in Louisiana. State v. Brown, 31,123 (La.App. 2nd Cir.9/23/98), 719 So.2d 146; State v. Lewis, 95-0209 (La.App. 4th Cir.4/13/95), 654 So.2d 761.
Mr. Wojtkiewicz testified that he was the director of DNA research and training *1246 at the North Louisiana Crime Lab ("Crime Lab"). He has been qualified as an expert witness and has testified in virtually all of the courts in North Louisiana. Additionally, he has testified four or five times regarding DNA analysis. Mr. Wojtkiewicz has a Master's degree in microbiology and is a Ph.D. candidate at Tulane University in molecular and cellular biology. He worked at the Crime Lab from 1977 until 1991 when he left to pursue his Ph.D. Mr. Wojtkiewicz returned to the Crime Lab in 1995 when he accepted the position he held at the time of this trial. He has developed DNA testing techniques and has taught courses to forensic scientists regarding DNA analysis. Mr. Wojtkiewicz explained that he is not certified in molecular biology because he was asked to write and review tests taken by those seeking certification. While performing this function, the American Board of Criminalistics asked that he agree to a moratorium on taking the certification test. The Crime Lab is accredited to do DNA analysis.
Mr. Wojtkiewicz testified to his extensive education and experience in DNA testing techniques and analysis. He has worked in criminology and forensic serology since the late 1970's. While Mr. Wojtkiewicz has an extensive education in his field, experience alone may be enough. State v. Lewis, supra. The defense had ample opportunity on cross-examination to raise questions regarding Mr. Wojtkiewicz's qualifications and experience and the testing and analysis completed by the Crime Lab in this case. We find that the trial court did not abuse its discretion in accepting Mr. Wojtkiewicz as an expert in DNA analysis.

Assignment of Error No. 17: Cross-examination of Gloria Coleman
Defendant argues that the trial court erred by allowing the State to use improper impeachment evidence during the cross-examination of Defendant's mother, Gloria Coleman. We disagree.
On direct examination, Mrs. Coleman was questioned regarding the search of her home by sheriffs deputies and about the type of underwear her son wore. Mrs. Coleman testified that the last time the sheriffs deputies searched her home they brought with them a brown paper sack. She also testified that she did all the laundry for the household and that Defendant wore bikini underwear, not boxer shorts. According to Mrs. Coleman, she had not seen her son wear a pair of white boxer shorts with the cartoon character Garfield on them.
During cross-examination, the district attorney asked Mrs. Coleman if she was sure that her son did not wear boxer shorts. When she responded affirmatively, the district attorney played that portion of the audiotaped statement wherein Defendant admits that he was wearing boxer shorts with Garfield on them when the murders were committed. Before playing the tape, the district attorney distributed to the jury the transcript of Defendant's statement turned to the page that corresponded to that portion of the audiotape played.
La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to an issue in the case, including credibility. Under La. C.E. art. 611(A), the trial court has discretionary control over the examination of witnesses.
We believe that Mrs. Coleman's direct testimony was intended to suggest to the jury that the sheriffs deputies brought with them or planted the white boxer shorts. This line of questioning invited an attack on the credibility of her testimony by Defendant's admission that he did own a pair of white boxer shorts with Garfield on them. The fact that Defendant's statement had already been played to the jury and that a short portion of it replayed during this cross-examination is of no consequence. State v. Johnson, 595 So.2d 789 *1247 (La.App. 2d Cir.1992). Cross examination is the principal means by which the believability of a witness and the truth of his testimony are tested. State v. Harrison, 560 So.2d 450 (La.App. 2d Cir.1990), writ denied, 565 So.2d 433 (La.1990). We conclude, therefore, that the State's attempt to discredit Mrs. Coleman's testimony was proper under art. 611(B).

Assignment of Error No. 18: Improper rebuttal evidence
In this assignment, Defendant argues that the trial court erred by allowing the State to call Deputy Morgan in rebuttal. The State responds that Deputy Morgan was called to clarify an issue raised by the defense regarding the lack of fingerprints at the crime scene.
Deputy Morgan testified during direct examination that Defendant directed him to bloody socks he wore while committing the murders. The socks were recovered during the videotaping on March 18, 1996. It was unclear, however, from Deputy Morgan's testimony how or where Defendant may have worn the socks. During cross-examination of the State's expert, Mr. Wojtkiewicz, the defense questioned him as to the existence of identifiable fingerprints of Defendant at the crime scene. In rebuttal, the State called Deputy Morgan to establish that Defendant had told him that he wore the socks on his hands when he murdered the Teetsons.
Rebuttal evidence is that which explains, repels, disproves or counteracts. State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756. The control of evidence presented on rebuttal is within the sound discretion of the trial court and will not be disturbed except in extreme cases. State v. Bass, supra. Deputy Morgan's testimony sought to explain the lack of Defendant's fingerprints at the crime scene. As such, it was proper rebuttal testimony. We find, therefore, that Assignment of Error No. 18 lacks merit.

Assignment of Error No. 21: Consecutive versus concurrent life sentences
In this final assignment of error, Defendant asserts that the trial court erred in ordering that his life imprisonment sentence on each murder charge be served consecutively versus concurrently. Defendant claims that his sentence is unconstitutionally excessive. The State argues that the trial court properly exercised its discretion under La.C.Cr.P. art. 883 in ordering consecutive sentences under the circumstances presented in this case. We agree.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La.C.Cr.P. art. 883. It is within a trial court's discretion to order sentences to run consecutively rather than concurrently. State v. McCray, 28,531 (La.App.2d Cir.8/21/96), 679 So.2d 543; State v. Derry, 516 So.2d 1284 (La.App. 2d Cir.1987), writ denied, 521 So.2d 1168 (La. 1988).
Concurrent sentences arising out of a single cause of conduct are not mandatory, State v. Pickett, 628 So.2d 1333 (La. App. 2d Cir.1993); State v. Nelson, 467 So.2d 1159 (La.App. 2d Cir.1985), and consecutive sentences under those circumstances are not necessarily excessive. State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980); State v. Williams, 445 So.2d 1171 (La.1984); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.1987), writ denied, 508 So.2d 65 (1987).
Among the factors to be considered are the defendant's criminal history, State v. Ortego, supra; State v. Jacobs, 493 So.2d 766 (La.App. 2d Cir.1986); the gravity or dangerousness of the offense, State *1248 v. Adams, 493 So.2d 835 (La.App. 2d Cir. 1986), writ denied, 496 So.2d 355 (La. 1986); the viciousness of the crimes, State v. Clark, 499 So.2d 332 (La.App. 4th Cir. 1986); the harm done to the victims, State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir. 1983), writ denied, 435 So.2d 433 (La. 1983); whether the defendant constitutes an unusual risk of danger to the public, State v. Jett, 419 So.2d 844 (La.1982); the defendant's apparent disregard for the property of others, State v. Parker, 503 So.2d 643 (La.App. 4th Cir.1987); the potential for the defendant's rehabilitation, State v. Sherer, 437 So.2d 276 (La.1983); State v. Lighten, 516 So.2d 1266 (La.App. 2d Cir.1987); and whether the defendant has received a benefit from a plea bargain, State v. Jett, supra; State v. Adams, supra.
When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms. State v. Green, 614 So.2d 758 (La.App. 2d Cir.1993). A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence of record. State v. Strother, 606 So.2d 891 (La.App. 2d Cir. 1992); State v. Thompson, 543 So.2d 1077 (La.App. 2d Cir.1989), writ denied, 551 So.2d 1335 (La.1989); State v. Mims, 550 So.2d 760 (La.App. 2d Cir.1989), appeal after remand, 566 So.2d 661 (La.App. 2d Cir.1990), writ denied, 569 So.2d 970 (La. 1990); State v. Lighten, supra.
At the sentencing hearing, the trial court stated:
Article 883 of the Code of Criminal Procedure provides that if Defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. And I'm ordering that they be consecutive rather that concurrent and I'll now state my reasons. Article 905.4 lists several aggravating circumstances. This court is convinced that at least four of those aggravating circumstances are applicable here and that they are sufficient grounds to make the sentences consecutive and specifically the evidence was sufficient to show that you were engaged in the perpetration or attempted perpetration of either aggravated burglary, armed robbery, first degree robbery or simple robbery at the time these murders were committed. Also, the evidence is sufficient to show that you knowingly created a risk of death or great bodily harm to more than one person. Also, the evidence is sufficient to show that these offenses were committed in an especially heinous, atrocious or cruel manner, and that the victims in this case were both over the age of sixty-five. All of those, I find, are sufficient reasons to make these two life sentences consecutive.
We find that the record supports the trial court's order that Defendant's sentences be served consecutively. This final assignment of error lacks merit.

CONCLUSION
We have reviewed the record for error patent and found none.
For the foregoing reasons, Defendant's convictions and sentences are affirmed.
AFFIRMED.

APPLICATION FOR REHEARING
Before NORRIS, WILLIAMS, GASKINS, CARAWAY, and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] Deputies searched the Coleman residence on two occasions. It was during the second search that the boxer shorts were discovered in Defendant's laundry basket and seized as evidence.
[2] Sometime prior to 1965, Mr. Ervin was in charge of the auxiliary police in Springhill, and during that time he did make arrests.
[3] If a defendant, however, does establish a prima facie case, the burden then shifts to the state to come forward with a race-neutral explanation. This second step of the process does not demand an explanation from the state that is persuasive or even plausible. The reason offered by the state will be deemed race-neutral unless a discriminatory intent is inherent within that explanation. The persuasiveness of the state's explanation only becomes relevant at the third and final step which is when the trial court must decide whether the defendant has proved purposeful discrimination. Thus, the ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); Batson, supra; State v. Jackson, supra; State v. Green, supra. We believe that the race-neutral reasons for the State's peremptorily challenging Ms. Brooks, Mr. Kinsey and Ms. Barnes, as articulated by the district attorney, are sufficient to support the State's peremptory challenges. La.C.Cr.P. art. 795(D).
[4] The propriety of the court's acceptance of Mr. Wojtkiewicz as an expert in the field of DNA analysis is discussed infra under Assignment of Error No. 15.
[5] This handwritten statement is three pages in length and describes the murders in detail.
[6] This sentence was set aside with Deputy Valentine serving approximately four months in prison and receiving five years probation. After completing his sentence, Deputy Valentine received permission from the Department of Alcohol, Tobacco and Firearms to carry a firearm.
[7] La. C.E. art. 404(B) provides, in pertinent part:

(1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of person in order to show that he acted in conformity therewith.