778 So.2d 695 (2001)
STATE of Louisiana, Appellee,
v.
Hubert D. WALKER, Appellant.
No. 34,107-KA.
Court of Appeal of Louisiana, Second Circuit.
January 24, 2001.
*697 Louisiana Appellate Project by Peggy Sullivan, Counsel for Appellant.
Richard Ieyoub, Attorney General, James D. Caldwell, District Attorney, James Trey Phillips, Assistant District Attorney, Counsel for Appellee.
Before WILLIAMS, STEWART, and DREW, JJ.
DREW, J.
Charged with second degree murder in violation of La. R.S. 14:30.1, Hubert Delaney Walker was convicted by jury of second degree murder of Josephine Johnson McKinney (Josie). The trial court imposed a life sentence at hard labor without benefit of probation, parole or suspension of sentence. Appealing the conviction, Walker contends that his conviction was based upon insufficient evidence and that the trial court erred in admitting into evidence inadmissable hearsay and improper other crimes evidence. For the following reasons, the judgment of the trial court is affirmed.

FACTUAL BACKGROUND AND TESTIMONY
The defendant and the victim lived together in an apartment in Vicksburg, Mississippi where the victim was employed at the Isle of Capri Casino. The victim was last seen alive on Friday, June 13, 1997. Her badly decomposed body was found on Monday, June 16, 1997, in a bar pit next to the Mississippi River by a man inspecting his leased hay field near the levee at the Madison Parish Port near Tallulah, Louisiana. The body was identified by forensic examiners based upon a description of the location and content of a tattoo the victim's brother had given her and by the gap between her front teeth along with clothing and jewelry known to be the victim's. The forensic experts testified that the cause of death was a stab wound through the victim's left cheek which penetrated back to and cut across her neck vertebrae. According to the experts, that wound by itself would have been fatal, but there was also the possibility that the victim was alive when placed into the water and subsequently drowned.

Isle of Capri Supervisors
Marion Hill, a cage shift supervisor at the Isle of Capri, testified that Josephine Johnson was employed as an on-line cashier. About four p.m. on Friday, June 13, 1997, Hill received a phone call from Josie stating that she would be late for work because someone had borrowed her car and not returned it yet. Another cage shift supervisor, Monica Washington, testified that Josie called back about 5 pm to report that she would be unable to come to work because someone still had her car.

Richard Brown
Richard Brown testified that he was employed on June 13, 1997, as a supervisor at Complex Chemicals located at the Madison Parish Port, approximately eight miles north of Tallulah, La. At approximately 5:30 pm he passed a silver colored car occupied by two, possibly three, people including a bushy headed man with a mustache who was driving. Brown also identified a photo which he stated looked very similar to the individual he saw driving the car.

Ricky Eastman
Ricky Eastman stated that he was employed as truck driver at Madison Farm Supply which had fertilizer tanks at the Madison Parish Port. After 5 pm on June 13, Eastman drove over the levee and noticed a "bright colored" car and a black man and black woman. After he loaded his truck and was leaving, he again saw the man and woman walking on the levee.

Carlton R. Whitaker
Employed by Madison Farm Supply on the date in question, Carlton R. Whitaker testified that he was waiting for a late truck to load after 5 pm. He observed two *698 African-American persons who were engaged in a loud boisterous argument across the levee. Since he had some time before the late truck arrived, he went in his truck across the levee to fish. He got a good look at the man and woman who continued arguing. When he heard the truck arrive, he returned to his place of employment to load the truck after which he went home. He did not see the couple again.
When presented a photo line-up, Whitaker selected two photos that most closely resembled the man he had seen. Whitaker informed the officers he would like to see a live line-up and to see them walking because the man had been walking the whole time Whitaker observed him. Subsequently he observed a live line up at the DA's office which was adjourned. The next day Whitaker saw another live line-up at the jail and again selected the two who most looked like the man he had seen. Whitaker was taken across the street and observed the six people walking. Based on the man's profile and gait, Whitaker identified Hubert Walker as the man he had seen on the levee.

Lillian Walker
Lillian Walker testified pursuant to an agreement with the state that she would be granted immunity from prosecution in connection with this offense as long as she testified truthfully. Mrs. Walker testified that Hubert Delaney Walker, the defendant, was her son. Mrs. Walker called her son "Dee" and other family members referred to him as "Dee" or Delaney.
On June 13, 1997, her son and Josie, the victim, came by her house and ate catfish. Josie asked Mrs. Walker questions about Shearricee, another of defendant's girlfriends. Dee and Josie left when Josie said she had to go to work. Mrs. Walker went to Jackson with one of her daughters, Cassandra Faye Bryant, to pick up Cassandra's daughter, Lakeelee, who was on a pass from a mental health care center. The three returned to Mrs. Walker's home around five in the evening. The defendant arrived sometime later with wet feet and pants which he explained by stating he had been washing a car. He left after a short period of time.
Defendant returned to his mother's home sometime after midnight but before 3 or 4 am. Mrs. Walker stated he went back to his bedroom moving fast like he was high on drugs. Defendant told her: "Mama, I think I done something you ain't gon' be proud of." When she asked, defendant stated, "I think I killed Josie." Mrs. Walker told him not to lie and he replied that the less she knew, the better. He left her home. Mrs. Walker acknowledged the possibility that she may have called the police that night about the matter.
She also testified she and her daughter, Cassandra, discussed going to look for Josie. In an effort to locate Josie, she also said she went to the apartment building where her son and Josie lived together and called out for them both from the parking lot because she did not know which apartment was theirs.

Michael Bryant
A Vicksburg police officer, Michael Bryant, testified that he was on duty in the early morning hours of June 14 when he received a call about 2 am from a woman who asked what to do if someone had stated he had killed someone. Bryant told her it should be reported and asked if someone had told her that. The caller replied: "Yes, my son. My son, Hubert Walker, said that he had killed somebody." When asked who, the caller stated "He's killed his girlfriend, Josephine Johnson." When asked where, the caller stated she was not sure, but thought the Deville Apartments (in Vicksburg). The caller hung up when asked for her name.
Bryant looked though the department's records because someone previously arrested would have a next of kin listed. Bryant found some numbers on Hubert Walker. They tried to call the numbers listed but never located anyone. When he *699 received a call on Monday from the Warren County Mississippi Sheriff's Office that the victim's body had been found, Bryant related to that department the information about the phone call. On cross-examination, Bryant stated he did not know who called.

Deverick Hicks Watson
Testifying that friends and family called her "Pig," Deverick Hicks Watson stated she knew the Walker family including Cassandra, Lakeelee, defendant whom everyone called "Dee" and his mother. Watson stated she was at the Walker home between five and six with a number of family members and was there when the defendant came home wearing wet pants.

Shearricee Williams
Testifying that she used to live with the defendant, Williams stated she was seeing Dee around June 13, 1997, but he was at that time living with Josie. He came to her house sometime before 8:30 on that evening and they fixed drinks. He stated to her, "Well, she's gone." When she asked if Josie had gone to Louisiana, defendant replied yes. Defendant then asked her to marry him and said they would have to marry before Monday. Shearricee testified she accepted the proposal. They went to his mother's home where they visited and continued drinking with his family members. Sometime later, she, defendant and his niece, Lakeelee, went to the County Market. They returned to his mother's where many of the family were gathered. While defendant was holding his sister's baby, she noticed that defendant was crying.
On their way to her home on Friday night, she went with defendant to Josie's apartment in the Deville Apartments for the defendant to get his things. When defendant stated that Josie was not coming back, Shearricee asked if she could have some statues. The defendant told her to take what she wanted and she took three little statues and two fancy glasses. She and the defendant returned to her home and went to bed. Admitting she was "pretty loaded by then," she did not know if the defendant went out later.
The witness stated that she picked up from Mrs. Walker's home at Dee's request a pair of damp boots which she placed into a plastic bag. The defendant removed those boots from Shearricee's house on Saturday and stated "They can't stay here." On Saturday afternoon, Shearricee went through the defendant's wallet which he had left at her house. She said it was damp and contained no money. Shearricee found a pawn ticket which she hid. When asked why she was going through his wallet, Shearricee responded that the defendant had stolen the VCR he had given her for Valentine's Day and she wanted it back. When asked if the pawn ticket stated it was for a VCR, Shearricee responded the ticket said "gold chain, but he had stole a gold chain from me, too."

Julius Williams
Julius Williams testified that at the time of trial he was residing in a drug recovery center where he was seeking to overcome a thirteen year addiction to crack cocaine. In June 1997 Williams lived in Vicksburg, Mississippi with Sharon Michelle. Late on the night of June 13 or early in the morning of June 14, the defendant who was driving a light colored Mazda picked up Williams and his girlfriend as they were walking to a store to buy beer. Defendant wanted their assistance in selling a television and VCR in the car. They drove to the trailer of a man Sharon knew. While she was inside discussing the potential sale, the defendant and Williams remained in the car. The defendant told Williams that he had "f____ed up, that he had killed this b____ that he was living with." Defendant inquired if Williams knew somewhere to get rid of the car for some quick cash because he wanted to get out of town. Defendant said something to Williams about going to California.
Williams testified that Sharon was not successful selling the items at the first stop, but at the next stop, she sold the *700 VCR for $40. The trio returned to Vicksburg and brought crack cocaine. They went to Williams' apartment and got high. Toward morning, Sharon left with the defendant to go back to the deceased's apartment to get more items for Sharon to help defendant sell and to see if Sharon wanted anything.

Ernie Duncan
The defendant's sister and the daughter of Lillian Walker, Ernie Duncan testified that she resided in Long Beach, California during June 1997. On Saturday June 14, she received a phone call from Lakeelee Bryant, her niece, who was upset and informed her that the defendant (Duncan's brother and Lakeelee's uncle) had done something pretty bad pertaining to Josie. Ernie told Lakeelee to get off the phone so she could call her brother at her mother's home in Vicksburg. When she asked, the defendant said "no, but he had to do what he had to do." Later that night the defendant phoned Ernie and told her "they had gotten into it, but he said, you know, he hadn't seen her anymore." On Sunday he called Ernie to tell her not to worry because nothing had happened and he was high last night.
Ernie said that the defendant did not sound good and she repeatedly asked him what had happened. The defendant stated it was all taken care of, but he denied killing Josie. When Ernie asked if he had hurt Josie, the defendant responded that "She got what she deserved." Ernie thought he was high and talking out of his head. Ernie acknowledged telling an investigator in California that the defendant told her:
Small things is small things, and what had to be done had to be done, and if anybody else calls you, you don't know anything.
Josie deserves what she got. She thought that I was going to do her wrong. They thought that I was going to kill her in the house, but she thought I was gonna kill her in the house. It didn't work like that. I took her out. She tried to get away. She couldn't get away. The only thing that I can say is that she got what she deserved.

Cassandra Faye Bryant
Another sister of the defendant and the mother of Lakeelee Bryant, Cassandra testified that on June 13, 1997 Cassandra and her mother had been to the mental hospital in Jackson to pick up Lakeelee for a weekend visit. Cassandra testified that Lakeelee was diagnosed paranoid schizophrenic. Cassandra dropped off her mother and Lakeelee at Mrs. Walker's home around 7:30 in the evening and she returned about 8 pm. That evening she made plans with her mother to go look for Josie because Lakeelee had told her that defendant had killed Josie. They called Josie's relatives in Louisiana looking for her and Josie's place of employment. They learned Josie had not been at work that day.
Mrs. Walker told Cassandra that defendant had told her how he had killed her and what he did with the body. Cassandra's fiancé told them they could be charged as accessories if they found the body so they did not search. During the course of the weekend, Lakeelee because so upset about what the defendant had told her about killing Josie that Lakeelee had to be hospitalized. Cassandra stated she called the Vicksburg police and reported that the defendant had told Lakeelee that he had killed his girlfriend.

Wayne Stutts
A DA's investigator on June 13, 1997, Wayne Stutts testified he assisted in the investigation of the Josie's murder. He identified numerous photos he took of the scene, the victim's body and the pieces of the murder weapon. He also corroborated Whitaker's testimony about the photographic line-up in which Whitaker selected the two photos most closely resembling the person and requested an opportunity to see a live line-up with the men walking. He identified the defendant as the primary *701 person. At the later live line-up, he chose the same two subjects with the defendant again being his first choice. When Whitaker saw the participants of the line-up walk, Whitaker positively identified the defendant as the man he had seen on the levee. Stutts also testified that the victims' pants pockets had been turned inside out when the body was found. In addition to recovering three dollar bills from the water near the body, Stutts testified that Lakeelee reported that the defendant (her uncle) told her to get a five dollar bill from under the sun visor in Josie's car. Lakeelee stated that the money she found was wet.
In questioning the defendant, Stutts testified that the defendant told him that he and Josie had problems before, that he had held her hostage before. The defendant wept and also stated "I really f____d up, didn't I?" The defendant told Stutts if he could speak to his mother, defendant would tell Stutts everything he needed to know about the murder. After defendant's mother left, defendant denied committing the murder.

Phillip Demeranville
A patrol officer with the Vicksburg police, Phillip Demeranville testified that on May 13, 1997, the victim came to the police department to file a complaint against the defendant whom she described as insanely jealous and constantly following her. The victim stated she was scared of the defendant.

Jackie Johnson
Jackie Johnson testified that she was a Vicksburg patrol officer on May 20, 1997, when a call to 911 by Frenchette Johnson reported that her mother was being held captive in a bedroom at 1213 Openwood in Vicksburg. Police policy on domestic violence calls was to get a criminal history on the accused. When police learned that the defendant was inside and that he had a long criminal history from 1975, the supervisor sent other units to the scene. Defendant's criminal record included five assaults with a deadly weapon, aggravated battery, drug charges, and robbery.
When officers entered they found Josephine McKinney in bed with the defendant in a residence that showed signs of a struggle. The officers also found drug paraphernalia and notified his probation officer. The officer identified a photo of the victim as the person known to her as Josephine McKinney. She also identified the defendant as the man in the apartment that night with the victim. Because the woman had an injured lip and physical bruises, the defendant was arrested that night. In response to cross-examination, the officer stated that the defendant was found guilty of this charge and given thirty days.

Steven McCraney
Defendant's probation officer, Steven McCraney, testified that defendant received a twelve year sentence for burglary and grand larceny which was suspended. Defendant served one year in jail and then was released to five years supervised probation. During a discussion about whether the defendant was going to agree to be extradited to Louisiana, McCraney stated the defendant told him, "I guess I'm gonna go ahead and gon' on back to Louisiana, but they are going to have to saddle up their horse and they gon' to have to ride it because they gon' have to prove everything. I'm not going to tell `em anything." In response to cross-examination, McCraney testified that two drug tests on defendant were positive in May and June 1997.

Frenchette Johnson
Frenchette Johnson testified that she was the daughter of Josephine Johnson McKinney, the victim. A college student in California, Frenchette and her two year old nephew flew to Louisiana in May 1997 to visit her grandparents and other relatives in Maringouin and her mother in Vicksburg. Frenchette recounted an outing to Tallulah where the defendant showed them various places in the town where he had grown up. The defendant also took them to pick berries in sight of *702 the levee at the Madison Parish Port. Frenchette stated that her mother owned two cars, a champagne light colored Mazda and a blue Honda Accord. Frenchette testified that on a night in May, 1997 Josie gave her a note to quietly call the police after the defendant went to sleep because he had hit her and would not let her leave the house. Frenchette complied and the police arrested defendant. The next day she and her mother inventoried and packed up her mother's belongings and went to Josie's mother's home in Maringouin. Shortly, thereafter Frenchette returned to California.
Sometime after Frenchette returned to California, her mother returned to live in Vicksburg when she got a job at the Isle of Capri Casino. Frenchette's last conversation with her mother was on the Wednesday before Friday, June 13, 1997. At trial Frenchette identified the knife and the matching broken knife found at the murder scene as belonging to her mother. Frenchette also identified as her mother's property the statues and glasses Shearricee had taken from the victim's apartment. In addition, she testified that many electrical appliances were missing when she and her family got her mother's property. Frenchette also identified the ring and watch removed from the victim's body as those belonging to her mother.

Kirk Knowles
Louisiana State Trooper Kirk Knowles testified that in the early morning hours of Saturday, June 14, 1997 a caller to the Vicksburg police identifying herself as Hubert Walker's mother stated that her son had killed Josie Johnson. A check of phone records revealed that the call had been made from the residence of Isaac Branch, the husband of Lillian Walker, defendant's mother. In the first interview with the defendant in which officers sought information from the defendant about the victim's whereabouts, defendant told the officer that if they found the blue car, they would find Josie.

DISCUSSION
Homicide is the killing of a human being by the act of another. La. R.S. 14:29. La. R.S. 14:30.1 defines the crime of Second Degree Murder and provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
* * *
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Sufficiency of the Evidence
When issues are raised on appeal both as to sufficiency of the evidence and as to one or more trial errors, the appellate court should first determine the sufficiency of the evidence. The reason for reviewing evidentiary sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, *703 writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
However, this court's authority to review questions of fact in a criminal case does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La. App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
Defendant argued in brief that the evidence did not prove his guilt beyond a reasonable doubt. Defendant noted that two of the three men who saw the couple at the Port could not positively identify the defendant. He also objected to Whitaker's positive identification of Walker because Whitaker testified that the closest he saw the man was from 60 yards away. Although Whitaker testified that he observed the couple arguing, the defendant stresses that none of the three observed any violence or murder. Defendant also asserted that defendant's fingerprints were not found on the pieces of the knife believed to be the murder weapon and that no one testified as to the exact time of the murder.
This assignment of error has no merit. After a witness carefully considered two line-ups, defendant was positively identified as the person arguing with a woman at the Madison Parish Port. Numerous witnesses stated the defendant was seen later with wet clothing. Further, the defendant told a number of people who testified at trial that he had killed the victim. He also told others that the victim was gone and would not be coming back. The defendant disposed of many of the victims belongings. The apparent murder weapon came from the victim's apartment where she had lived with the defendant. Defendant had a recent history of violence and stalking against this victim. Primarily defendant's own actions and comments to members of his own family, friends and associates establish that he is guilty of this extreme, tragic act of domestic violence. A review of this entire record shows that the direct and circumstantial evidence viewed in the light most favorable to the prosecution was sufficient for a reasonable jury to conclude beyond a reasonable doubt that the defendant was guilty of the second degree murder of Josie Johnson McKinney.

Hearsay
Hearsay is a statement other than one made by the declarant and offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). The defendant attacked on appeal the statements attributed to Lakeelee Bryant by her aunt, Ernie Duncan, and her mother, Cassandra Faye Bryant as being inadmissible and prejudicial hearsay to which the defendant objected at trial. Specifically, the aunt testified that Lakeelee told her that the *704 defendant had done something bad which had to do with Josie. Her mother testified that Lakeelee told her the defendant stated he had killed Josie.
When hearsay evidence is improperly admitted at trial, the appellate court must decide whether the evidence contributed to the verdict. If the inadmissible hearsay evidence is merely cumulative or corroborative of other testimony introduced at trial, its admission is considered harmless. State v. Coleman, 32,906 (La.App.2d Cir.4/5/00), 756 So.2d 1218. Even if Lakeelee's statements about which her aunt and mother testified were considered improperly admitted hearsay, those statements were merely cumulative and corroborative of testimony given by the defendant's mother, by Ernie Duncan's account of her own conversations with the defendant, by defendant's girlfriend Shearricee, and by Julius Williams who accompanied the defendant when he sold a VCR with the help of Julius' girlfriend. Any error was harmless. That assignment of error is without merit.

Other Crimes Evidence
Generally, evidence of other crimes is inadmissible at a criminal trial unless the probative value of the evidence outweighs its prejudicial effect. This general rule ensures that a defendant who has committed other crimes will not be convicted of a present offense simply because he is perceived as a "bad person," regardless of the evidence or lack thereof. A conviction should be based on guilt and not on character. One important safeguard is advance notice that such other crimes evidence will be offered. This prevents surprise and allows a defendant an opportunity to prepare a meaningful defense. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94.
Prior to trial, the state filed a Notice of Intent to Use Other Crimes which included seven categories including (1 & 2) two prior acts against the victim, (3) a prior attack in 1994 by defendant against his mother and the following: (4) defendant's conviction of burglary and grand larceny in Warren County, Mississippi; (5) defendant's NCIC list showing numerous arrests and convictions; (6) defendant's theft of victim's property sold for crack cocaine on June 13, 1997 and June 17, 1997; and (7) defendant's giving away the victim's property with the statement "take what you want, the bitch ain't coming back" on June 13, 1997 and June 17, 1997.
At the pre-trial Prieur hearing, the trial court stated it would focus on the first three "other crimes" items listed. Concerning the remaining items 4 through 7 the trial court commented that they may not fit into the other crimes or bad acts categories [as the first three did], but that the court would deal with them as they got to them. The trial court stated that if either the State or Defense thought it necessary, the court would consider the other alleged crimes and bad acts (4 through 7) when the court finished considering items 1 through 3. The trial court ruled that defendant's acts against the victim (1 & 2) were admissible and his 1994 attack on his mother (3) was inadmissible. At that time the trial court asked if either side saw the need for a Prieur hearing on the remaining items. The State responded that, out of an abundance of caution, warning was being provided to defendant that the listed items might come up. To the court's question of whether other items needed to be ruled on in a Prieur hearing, the defendant's counsel replied in the negative.
First, Defendant complained that the trial court erred in denying his motion for a mistrial made after Shearricee Williams testified that she went through the defendant's damp wallet looking for property belonging to her. She removed and secreted a pawn ticket for a gold chain because defendant had stolen a VCR and a gold chain which she wanted back. After *705 testimony about both items, the defense objected and sought a mistrial.
In denying the mistrial, the trial court noted that the specific alleged thefts mentioned by the witness were not included in the pre-trial notice of other crimes evidence. The court found that the State questioned the witness about going through defendant's wallet looking for property. When asked why she hid the pawn ticket, the witness stated defendant had stolen a VCR. When asked if the pawn ticket was for a VCR, the witness volunteered that defendant had stolen a gold chain from her. The trial court found no basis for a mistrial because the witness's responses were unresponsive and there was no evidence of bad faith on the part of the state. The trial court also found that the testimony about the damp condition of the wallet was relevant and that her testimony was necessary to explain the witness's actions in examining the defendant's wallet. The trial court offered to give an admonition to the jury to disregard any references to other crimes which defense counsel declined.
Notwithstanding the mandatory language in La. C. Cr. P. art. 770, the article is a rule of trial procedure. Erroneous introduction of inadmissible other crimes evidence is subject to a harmless error analysis. Trial error is harmless when the verdict is surely unattributable to the error. State v. Johnson, supra. The determination as to whether a mistrial should be granted lies within the sound discretion of the trial judge. A denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. A witness's voluntary, unresponsive testimony which implicates a defendant in other crimes does not require a mistrial, at least where the form of the prosecutor's question does not indicate bad faith. State v. Ingram, 29,172 (La.App.2d Cir.1/24/97), 688 So.2d 657, writ denied, 97-0566 (La.9/5/97), 700 So.2d 505, writ denied, 98-2845 (La.3/26/99), 739 So.2d 785. The trial court did not abuse its discretion in denying a mistrial based on this unresponsive testimony.
Additionally, on appeal defendant contended he was entitled to relief because of inadmissible other crimes testimony. First, Vicksburg Police Officer Jackie Johnson testified about an incident in which defendant beat and held the victim captive in her apartment, an event ruled admissible at the Prieur hearing. During the course of her testimony, Johnson explained the procedures for domestic violence calls included checking the criminal record of a suspect. Johnson testified that the defendant had a lengthy criminal history including multiple assaults with a deadly weapon, robbery and drugs. The policeman also testified that she observed drug paraphernalia and notified the defendant's probation officer.
Second, Defendant's probation officer testified about defendant's criminal conviction for burglary and grand larceny. Both of the these witnesses testified without objection at trial from the defendant. Defendant had pre-trial notice of the State's intention of possibly using these crimes as evidence at trial. Although these matters apparently were not litigated at the Prieur hearing, the defendant rejected the trial court's offer to take evidence on these matters at the pre-trial Prieur hearing. The trial court specifically stated that it would rule on those matters as they came up at trial at which defendant did not object to the evidence.
In State v. Cooks, 97-0999 (La.9/9/98), 720 So.2d 637, U.S. cert. denied, the state had provided notice of its intent to use other crimes evidence and the defense did not seek to have a pre-trial hearing. Further, the defendant did not object at trial to multiple testimony about the defendant's gang affiliations. On appeal the defendant contended the testimony was inadmissible references to other crimes. Because the defendant had not made contemporaneous objections to the testimony at trial, the supreme court held *706 that the claim was not reviewable on appeal. La. C. Cr. P. art. 841. Similarly, this defendant was given pre-trial notice of this other crimes evidence and declined an opportunity to have it examined at a Prieur hearing on other matters. Although the trial court specifically stated that it would rule on those matters as they came up, defendant made no objection to the testimony at trial. Defendant's assignments of error about the testimony of the police officer and his probation officer are not reviewable on appeal.

DECREE
For the foregoing reasons, the conviction is AFFIRMED.