850 So.2d 1035 (2003)
STATE of Louisiana, Appellee,
v.
Michael Larue MACK, Appellant.
Nos. 37,174-KA, 37,175-KA.
Court of Appeal of Louisiana, Second Circuit.
June 27, 2003.
*1038 James E. Beal, Jonesboro, for Appellant.
Robert W. Levy, District Attorney, Stephen Kendall Hearn, Jr., Clifford Royce Strider, III, Assistant District Attorneys, for Appellee.
Before BROWN, WILLIAMS, and PEATROSS, JJ.
BROWN, C.J.
Defendant, Michael Larue Mack, was convicted of second degree murder and attempted second degree murder. He was sentenced to life imprisonment at hard labor on the second degree murder conviction and 49 1/2 years on the attempted second degree murder conviction. Both sentences were imposed without benefit and were ordered to run consecutively. Defendant appeals his convictions and sentences. Finding no error, however, we affirm.

Facts
Just after 1:00 p.m. on July 15, 1998, authorities at the Lincoln Parish Sheriff's Office in Ruston, Louisiana, received two 911 calls within minutes of each other. The callers reported that shots had been fired and that two persons had been shot at 132 Peachland Trailer Park, located on Hwy. 80 west, halfway between Ruston and Grambling. By the time Steven Rogers, the primary investigator, arrived at approximately 1:21 p.m., numerous police cars and two ambulances were already on the scene. A crowd of adults and children was gathered outside the mobile home. According to the deputy, there was a lot of *1039 "screaming and crying." Inside the residence he found emergency medical personnel working on two wounded men.
At the time of the shooting, eleven people, six adults and five children ranging in age from seven months to twelve years old, were in the trailer. The residence belonged to Mary Scott, who was not at home during the shooting. Because the witnesses were so distraught, Dy. Rogers did not conduct formal interviews at the scene that day, but he did collect evidence and take photographs. As a result of the shooting, Patrick Scott ("Patrick") was killed and Glenn Patrick ("Glenn") lost his right leg.
Information provided at the scene led to a "be on the lookout" bulletin (which was broadcast at 1:28 p.m.) for a green Toyota Tercel occupied by a bald, medium-colored black man wearing boots, camouflage pants and a t-shirt. Almost immediately, the owner of Ruston Pawn and Gun, Bruce Carter, called the sheriff's department to report that a man fitting the description that had just been broadcast had just been in his store buying a box of ammunition for an SKS, AK-47 assault rifle. Bruce also related that this same man had bought a box of the same type ammunition on the previous day.
An arrest warrant for defendant was filed just days after the shooting; however, he was not indicted until December 28, 2000. Apparently, after the shooting, he fled to Canada. Lincoln Parish authorities enlisted the assistance of the FBI to track down defendant, who was eventually found in Canada where he was arrested on other charges. Defendant was extradited to Jefferson Parish, Louisiana, where he went to trial on two other charges before being released to the Lincoln Parish authorities. Prior to his indictment, defendant filed a pro se motion for speedy trial in Lincoln Parish. The speedy trial motion was granted on July 11, 2001. However, a motion filed by his attorney to quash the indictment for failure to prosecute was denied that same day.
A three day trial began on May 21, 2002. The primary investigator, four men and one woman who had been at the trailer during the shooting, a passenger in the green Toyota Tercel, the pawnshop owner, the 911 dispatcher, a crime lab specialist, and the coroner were called by the state. Defendant called one witness, Dr. Edward Banks, a former Grambling State University assistant dean, who stated that he saw defendant the day of the shooting on the Grambling campus between 1:00 and 1:45 p.m.
On May 23, 2002, the jury unanimously found defendant guilty of second degree murder and attempted second degree murder. A motion for new trial and motion for post-verdict judgment of acquittal were denied. Defendant was sentenced to life imprisonment on the second degree murder conviction and 49 1/2 years on the attempted murder conviction. The sentences were ordered to run consecutively and without benefit. Defendant's timely filed motion to reconsider sentence was denied and this appeal ensued.

Discussion
Sufficiency of the Evidence
Defendant first asserts that the evidence was insufficient to convict him of second degree murder and attempted second degree murder. According to defendant, the testimony of most of the lay witnesses should have been disregarded by the jury because there are inconsistencies in their testimony, and their identifications of defendant were tainted.
Applicable Legal Principles
As set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 *1040 (1979), the critical inquiry in reviewing the sufficiency of the evidence to convict is whether the evidence reasonably supports a finding of guilt beyond a reasonable doubt. Specifically, the issue is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense established beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
La. C. Cr. P. art. 821 provides that a motion for post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. State v. Combs, 600 So.2d 751 (La.App. 2d Cir. 1992), writ denied, 604 So.2d 973 (La. 1992).
La. C. Cr. P. art. 851(1) provides that the court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence, i.e., that the evidence is insufficient to sustain the conviction. Under this article, the trial judge has wide discretion to determine the weight of the evidence. The refusal to grant a new trial is not subject to appellate review, except for error of law. State v. Mitchell, 26,070 (La.App.2d Cir.06/22/94), 639 So.2d 391, writ denied, 94-1981 (La.12/16/94), 648 So.2d 387, citing Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); State v. Robinson, 624 So.2d 1260 (La.App. 2d Cir.1993), writ denied, 93-2899 (La.02/11/94), 634 So.2d 372; State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court must defer to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra.
Trial Testimony
At the time of the shooting, there were eleven people in the mobile home: six adults and five children between the ages of seven months and twelve years old. As noted above, the trailer belonged to Mary Scott, who was not at home when the incident occurred. Her son, Mario Scott, stayed there occasionally. On the morning of July 15, 1998, Mario had picked up Carlos Scott and Glenn Patrick to go to the mobile home.[1] Patrick Scott and a family friend, Shalena Stafford ("Shea"), and several young children were already at the trailer when Mario, Carlos, and Glenn arrived. Shea left to pick up Timothy Rhone ("Timothy"), who was going to give haircuts to some of the men at the trailer. While Shea was gone, Aquanita Harris ("Aquanita") came to the trailer to purchase cocaine from Mario. He told Aquanita that he did not have any cocaine, but that she could come back in a few minutes, and he should be able to have the drugs by then.
Aquanita testified that she had been brought to the mobile home in a green *1041 Toyota Tercel driven by Tiffany Burns ("Tiffany"), a girlfriend of defendant, Michael Mack. Aquanita testified that defendant had ridden to the trailer park with her and Tiffany, but that when she got back into the car after trying to buy cocaine, he was not in the car. Jerry Maiden, Jr., the owner of the Toyota, testified that he shared a home with Tiffany and several other people. Jerry stated that defendant, who he knew as Malek, was with Tiffany when she asked to borrow his car on the morning of the shooting. Jerry testified that Tiffany brought the car back around 4:00-6:00 p.m. that afternoon.
Four of the men, Patrick, Glenn, Carlos and Timothy, as well as one (or two) of the male children were in the back bedroom of the trailer. Patrick was ironing. Everyone was waiting for Mario, who was in the front bedroom, to finish getting dressed so that he could get his hair cut. There was some music playing but not so loudly that they couldn't carry on a conversation. Timothy testified that he was standing at the window when he saw the curtain fly back and defendant point a rifle at him. The window did not have a glass covering, but had over the opening what most witnesses described as a blanket.
When the gunman stuck the rifle through the window, Timothy and Carlos were standing in the doorway.[2] Patrick, Glenn and a young boy were sitting on the bed. Timothy testified that defendant pushed the blanket back and pointed the weapon right at him; they were "eye to eye." Timothy stated that he got a good look at defendant's face. Timothy thought that the gunman was a law enforcement official coming after him, so he ran out of the trailer, climbed over a fence, and ran into the nearby woods. He subsequently fled to Houston and was extradited to Lincoln Parish on drug charges approximately a year and a half after the shooting. Upon his return, he picked defendant out of a photo line-up.
Shea testified that she saw the green car leaving the trailer park as she and Timothy were driving to the mobile home. Aquanita was riding with a black female who had a turban on her head. About ten minutes after Shea and Timothy got to the mobile home, the shooting started. She and Mario were sitting at the kitchen table when she heard the shots. Shea grabbed her seven-month-old son and ran to the bedroom in the front of the trailer. Glenn, who had been shot, joined her in the front room. The blinds were open, and she saw the green car she had seen earlier speeding away. Shea stated that she didn't know how many people were in the car at that time. She used the phone in the trailer to call 911 to report the shooting.
Glenn testified that his back was to the window but that he first heard a "bumping" sound outside the trailer, then heard a man yell, "I got y'all mother fnow." Glenn ran from the room but returned immediately to get the young boy who was too stunned to get out of the room. It was at this time that Glenn got a glimpse of defendant, who then shot him in the leg.[3] Because of his injuries, Glenn lost a large amount of blood, and his right leg had to be amputated below the knee. He was hospitalized for over a month and then underwent intensive rehabilitation. He now wears a prosthetic device.
Carlos testified that he also heard a "bumping" noise prior to the shooting. His brother Patrick moved the curtain *1042 back, and defendant stuck the rifle in the window and began shooting. Carlos noticed that the gunman had gold teeth. He also heard the shooter say, "I got ya'll mother fnow."
The 911 dispatcher testified that at 1:28 p.m. authorities sent out a bulletin for persons to be on the lookout for a green Toyota Tercel occupied by a black male who was a suspect in the shooting. Almost immediately, Bruce Carter, the owner of Ruston Pawn and Gun, called the sheriff's department to report that a person fitting the description that had just been broadcast had just been in his store buying a box of ammunition for an SKS, AK-47 type rifle. Bruce also related that defendant had been in the store the previous day and had purchased a box of the same type ammo at that time. The expert from the crime lab testified that eight spent cartridges recovered from the crime scene were fired from an SKS rifle.
Analysis
The crux of defendant's argument is that the four persons who claim to have seen him on the day of the shooting testified that they only got a "glimpse" of the shooter. Therefore, it is defendant's position that none of them could positively identify him as the shooter. He likewise attacks the use and accuracy of the photo line-ups as well as the in-court identifications.
Two of the witnesses, Timothy Rhone and Carlos Scott, had seen a newspaper photograph of defendant before they were asked to pick the shooter out of a photo line-up. It is not known what weight, if any, the jury put on this evidence. Even if the photo line-ups were discounted, in his prior statement Carlos described the gunman, being the only person to notice that the shooter had gold teeth. At trial, defendant was ordered to display his teeth for the jury.
Of the three people in the back bedroom who survived the shooting, only two men, Glenn and Carlos, heard the gunman say, "I got ya'll mother fnow." However, the evidence shows that the person who did not overhear that remark, Timothy Rhone, was standing in or by the doorway. Furthermore, there was music playing in the back bedroom. Timothy testified as follows:
Q: You thought it might be the police out there?
A: Yeah.
Q: Did you hear any noise before the shooting? Anybody knock or anything? Any knocking noise or anything to call your attention?
A: I was back and forth, was trying to see what was taking Mario so long. I really wasn't hearingI didn't hear no noise.
* * *
Q: Okay. And whoever it was in the window did not say anything, did they?
A: I didn't even stay to see if he said something or not.
Q: I don't understand you. What?
A: I didn't even stay to see if he said something or not.
This testimony, elicited on cross-examination, shows that Timothy was not paying attention at the beginning and that he quickly ran as soon as he realized that there was someone with a gun at the window. The evidence established the possibility that the gunman made the statement either early on while Timothy was "back and forth" or that the statement was made after Timothy got out of the room.
Defendant also points out that the testimony of Mario Scott and Timothy Rhone was contradictory regarding their flight away from the shooting. Timothy testified that as he was trying to get out of the *1043 trailer, Mario had difficulty opening the door. On both direct and cross-examination, Timothy testified that as he and Mario were running, he passed Mario up, jumped the fence, then ran into the woods. According to Timothy, Mario was behind him. Mario testified that the door jammed, but he was able to get it open and get out of the trailer. Timothy ran past him and then Mario saw defendant come from behind the trailer. According to Mario, defendant had stopped and was "messing with the gun." Mario stated that it appeared as if the weapon had jammed and he "could still see the smoke from the barrel."[4] Mario testified that he ran off in the same general direction as Timothy. On cross-examination, he related that after he and Timothy got out of the mobile home, he paused for a second because the shooting had stopped and he wanted to go back inside to check on everybody. At that point, he saw the shooter. Mario stated that the gunman was baldheaded, wearing army fatigues and carrying what appeared to be an AK-47 rifle.[5] After defendant ran away, Mario went back into the trailer briefly. He then ran back out of the trailer, jumped over a fence, and ran into the woods. He stated that he had Timothy in his sight while he was fleeing.
Obviously, it was crucial to the defense that Mario's testimony be discredited, inasmuch as he was the witness who literally saw defendant "with a smoking gun." Be that as it may, we find no significant contradictions in this testimony. Furthermore, as noted above, a spent shell was found by officers in the area described by Mario.
There was also conflicting testimony regarding whether Mario resided in the trailer, whether there was a working telephone in the mobile home, the number of times that some of the witnesses came and went that day, and the number of times Aquanita went to the trailer that day looking for drugs. Defendant also emphasizes that a critical piece of information, that defendant was brought to the trailer park that day, was not told to investigators during the investigation. However, it was Aquanita's testimony that no one had ever asked her whether defendant had been with her and Tiffany that day and, because of the nature of her visits to the trailer park, i.e., to buy drugs, she did not volunteer the information.[6]
Facing the difficult task of attacking the credibility of numerous eyewitnesses, defense counsel did an excellent job of pointing out a number of inconsistencies in the eyewitness testimony. In fact, two of the witnesses related information that had not been originally told to the authorities. Nonetheless, the prosecutor managed to restore or rehabilitate the witnesses' credibility.
In State v. Williams, 35,911 (La.App.2d Cir.09/18/02), 828 So.2d 180, this court recently pointed out that:
[W]hen a witness is impeached, this simply means the jury, as the trier of fact, is presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury is prohibited from believing anything *1044 said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony. State v. Dunn, 30,346 (La.App.02/25/98), 708 So.2d 512; State v. Bender, 598 So.2d 629 (La.App. 3d Cir.1992), writ denied, 605 So.2d 1125 (La.1992).
During the three day trial, the state presented, and the defense was unable to shake, the witnesses' statements that they saw and could positively identify defendant as the gunman. Each person who testified that they saw defendant with the assault rifle also testified that defendant was partially bald and was wearing camouflage-colored clothing. The three witnesses who were in the back bedroom testified consistently as to where they and the victim were located and what they were doing prior to the shooting. Furthermore, all adults present in the trailer during the shooting testified consistently regarding the occupants of the trailer and what they were doing at the time of the shooting.
Likewise, the circumstantial evidence supports the guilty verdicts in this case. Aquanita testified that she, defendant and Tiffany drove to the trailer park in a green Toyota immediately before the shooting. After going inside the mobile home to talk to Mario, Aquanita got back into the car. At that time, defendant was no longer in the green car.
Only moments after the shooting, the pawn shop owner called in to report that defendant, dressed as described by the witnesses and in the same color and make vehicle as broadcast on the radio, had just been in his store buying more ammunition. The witness also stated that he recognized defendant because he had bought a box of similar ammunition just the day before the shooting.
Having reviewed the evidence in the light most favorable to upholding the jury's verdict, we are unable to determine that the testimony of the witnesses is contradictory regarding the major elements of the crimes of conviction or that the physical evidence presented any contradictions vis-a-vis the testimony. This assignment of error is without merit.
Use of Defendant's "Muslim" Name
According to defendant, he is entitled to a mistrial based on the prosecution's intentional use of defendant's Muslim name at trial, which was soon after the 9-11 terrorist attack. It is defendant's position that the state used defendant's Muslim name for the sole purpose of inflaming the jury. On the other hand, the state asserts that it was simply laying groundwork because one witness knew defendant only by his Muslim name.
Reference to defendant's Muslim name occurred twice in direct testimony. The first time, the prosecutor asked the investigator whether defendant went by any other name. Defense counsel objected, based upon the witness's apparently equivocal answer, "Malek. Malek Shabazz, I believe. I don't know if I'm pronouncing it correctly." The basis for defendant's objection was that the investigator did not know the name and also that it was hearsay evidence. This objection was overruled by the court. No objections were made, however, when the name came up in testimony by one of the prosecution's witnesses, Jerry Maiden, on cross-examination of the defendant's witness, Dr. Edward Banks, or during the state's closing remarks. Furthermore, defendant did not file a motion for mistrial or request an admonishment after his sole objection.
Nonetheless, as held by the supreme court in State v. Baylis, 388 So.2d 713 (La.1980), when a defendant's objection to improper remarks is overruled, he *1045 is not required to make a useless motion for admonition or a mistrial to preserve his rights on appeal. See also State v. Ballay, 01-493 (La.App. 5th Cir.10/17/01), 800 So.2d 953; State v. Johnson, 98-281 (La. App. 5th Cir.09/29/98), 719 So.2d 1141; State v. Clay, 612 So.2d 266 (La.App. 4th Cir.1992); State v. Dorsey, 561 So.2d 974 (La.App. 4th Cir.1990), writ denied, 566 So.2d 984 (La.1990).
"Hearsay" is a statement other than one made by the declarant while testifying at the present trial or hearing offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay evidence is regarded as being unreliable because it is based upon statements made by persons who are not before the court, have not been sworn, and are not available for cross-examination. State v. Bratton, 32,090 (La.App.2d Cir.06/16/99), 742 So.2d 896; State v. Tate, 25,765 (La. App.2d Cir.02/23/94), 632 So.2d 1213, writ denied, 94-1218 (La.08/23/96), 678 So.2d 33. By definition, a statement not introduced to prove the truth of the matter asserted is not hearsay. La. C.E. art. 801(C); State v. Tate, supra; State v. Hicks, 607 So.2d 937 (La.App. 2d Cir. 1992).
When hearsay evidence is improperly admitted at trial, the appellate court must decide whether the evidence contributed to the verdict. If the inadmissible hearsay evidence is merely cumulative or corroborative of other testimony introduced at trial, its admission is considered harmless. State v. Walker, 34,107 (La. App.2d Cir.01/24/01), 778 So.2d 695, writ denied, 01-0783 (La.01/25/02), 806 So.2d 669; State v. Coleman, 32,906 (La.App.2d Cir.04/05/00), 756 So.2d 1218, writ denied, 00-1572 (La.03/23/01), 787 So.2d 1010.
Even if Dy. Rogers' statement that defendant was also known as Malek Shabazz was considered to be improperly admitted hearsay, this statement was merely cumulative and corroborative of the testimony given by Jerry Maiden and Dr. Banks, both of whom related that they knew defendant by the name Malek Shabazz without objection by the defense. Any error was harmless. See State v. Walker, supra.
Likewise, defendant did not object to the prosecutor's reference to his Muslim name in closing statements. Considering the evidence in its entirety, we cannot say that the reference to defendant's Muslim name was of such an inflammatory nature as to have had a prejudicial impact on the jury. In other words, the evidence was overwhelmingly sufficient such that, even without the remarks or references to defendant's Muslim name, the jury could have found defendant guilty. See State v. Green, 416 So.2d 539 (La.1982). This assignment of error is without merit.
Excessiveness of Sentence
Defendant was given a life sentence for the second degree murder conviction and 49 1/2 years on the attempted second degree murder conviction. While he does not contend that the individual sentences are excessive, he does take issue with the fact that the trial court ordered the sentences to be served consecutively. According to defendant, the trial court erred in imposing consecutive sentences for convictions which arose from a single course of conduct.
Applicable Legal Principles
La. C. Cr. P. art. 883 provides that when two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. *1046 State v. Pickett, 628 So.2d 1333 (La.App. 2d Cir.1993), writ denied, 94-0348 (La.05/20/94), 637 So.2d 476; State v. Nelson, 467 So.2d 1159 (La.App. 2d Cir. 1985). It is within a trial court's discretion to order sentences to run consecutively rather than concurrently. State v. Robinson, 33,921 (La.App.2d Cir.11/01/00), 770 So.2d 868; State v. Coleman, supra; State v. Derry, 516 So.2d 1284 (La.App. 2d Cir. 1987), writ denied, 521 So.2d 1168 (La. 1988). All factors in the case are to be considered in choosing whether to impose consecutive or concurrent sentences. State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980). A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence of record. State v. Strother, 606 So.2d 891 (La.App. 2d Cir.1992), writ denied, 612 So.2d 55 (La.1993).
Defendant's actions put a number of persons, including several small children, at risk and resulted in the death of one person and the permanent disabling of another. The trial court noted that there were no mitigating factors. Having reviewed defendant's PSI, the court noted that defendant had a felony criminal history dating back to 1989. We find that the trial court properly stated the factors it considered and gave reasons in support of its decision to impose consecutive rather than concurrent terms, satisfying both the statutory and jurisprudential requirements. State v. Coleman, supra; State v. Green, 614 So.2d 758 (La.App. 2d Cir. 1993).
The trial court's determination that the sentences should be served consecutively is valid in light of the fact that the offenses of conviction involved extreme violence randomly directed, which resulted in the killing of one person and severe injuries to another. The court's finding that defendant is a violent, dangerous criminal who should remain in custody for life, under these circumstances, does not shock our sense of justice. This assignment of error is meritless.
Denial of Speedy Trial Motion
In a pro se brief, defendant complains that the delay from the time he was accused of the crimes until his trial violated his rights to a speedy trial.
Pertinent Facts
Although warrants for defendant's arrest were issued on July 16, 1998, defendant was not indicted until December 28, 2000. On September 4, 1998, the FBI issued a warrant for flight to avoid prosecution after being notified by Lincoln Parish authorities that defendant's vehicle had been found abandoned in New Orleans. On November 10, 1998, defendant was located in Canada and arrested for illegal entry into that country. He was deported and held in New York. Lincoln Parish authorities were preparing to file to have defendant returned to Lincoln Parish when he was extradited to Jefferson Parish on January 21, 1999. The Lincoln Parish authorities requested that Jefferson Parish place a hold on defendant on that date.
Defendant was held in Jefferson Parish in connection with two charges and remained in jail. Trial of the first charge was held in November 1999; defendant was acquitted of that charge. On October 30, 2000, defendant pled guilty to the second charge and was sent to Winn Parish Correctional Center.
Defendant was then indicted by a Lincoln Parish grand jury on December 6, 2000, and brought to that parish on December 28, 2000, at which time he was arrested and arraigned. Trial was set for March 19, 2001.
*1047 It was discovered that defendant had filed a pro se motion for speedy trial under La. C. Cr. P. art. 701 on August 8, 2000, prior to his indictment in Lincoln Parish. The defense sought to continue the trial so that this motion and a motion to quash which was filed by counsel on January 24, 2001, could be heard on May 7, 2001. A hearing was held on May 7, 2001; at that time, the defense again sought a continuance because one of its witnesses was not present. The motions were subsequently heard on July 5, 2001, and defendant's pro se motion for speedy trial was granted on July 11, 2001. The motion to quash the indictment for failure to timely prosecute, however, was denied that same day. As noted in the minute entries, defendant sought two further continuances of the trial, one on July 12, 2001, and one on October 15, 2001. Trial in this matter began on May 21, 2002.
Applicable Legal Principles
It is well-settled that there are two separate and distinct bases for a defendant's right to a speedy trial: a statutory right granted by La. C. Cr. P. art. 701 and a constitutional right embodied in the Sixth Amendment to the United States Constitution and Article I, Section 16 of the Louisiana Constitution of 1974. The two are not equivalent. State v. Leonard, 499 So.2d 585 (La.App. 2d Cir.1986); State v. Price, 96-680 (La.App. 5th Cir.02/25/97), 690 So.2d 191.
La. C. Cr. P. art. 701 provides that the sole remedy for failure to commence trial within the mandated time period is pretrial release without bail. Once a defendant has been tried and convicted, his allegation that article 701 has been violated becomes moot. State v. Hebert, 29,062 (La.App.2d Cir.01/22/97), 688 So.2d 612; State v. Outley, 629 So.2d 1243 (La.App. 2d Cir.1993), writ denied, 94-0410 (La.05/20/94), 637 So.2d 476; State v. Johnston, 480 So.2d 823 (La.App. 2d Cir. 1985).
We will, however, analyze defendant's constitutional right to speedy trial as to this delay and will address the denial of defendant's motion to quash the indictment as well.
The right to a speedy trial is fundamental and is guaranteed to an accused. U.S. Const. amends. VI and XIV; La. Const. art. I, § 16; Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); State v. Jordan, 35,643 (La.App.2d Cir.04/03/02), 813 So.2d 1123. The right attaches when an individual becomes an accused, either by formal indictment or bill of information or arrest and actual restraint. State v. Bodley, 394 So.2d 584 (La.1981); State v. Jordan, supra. Louisiana has adopted the balancing test set forth in Barker v. Wingo, supra, in which the conduct of both the state and the defendant are weighed. The four factors to be considered are: (1) length of the delay; (2) reason for the delay; (3) defendant's assertion of his right; (4) prejudice to the defendant, such as the possible impairment of the presentation of the accused's defense. Id.; State v. James, 394 So.2d 1197 (La.1981); State v. Jordan, supra; State v. Johnston, 480 So.2d 823 (La. App. 2d Cir.1985).
Analysis
Although both defendant and his attorney argued that the institution of prosecution was on the date the arrest warrant was issued, it is the date of indictment, not the arrest warrant date, which is considered to be the institution of prosecution. See La. C. Cr. P. art. 934(7); State v. Butler, 302 So.2d 585 (La.1974); State v. Jones, 34,542 (La.App.2d Cir.02/28/01), 780 So.2d 1234, writ denied, 01-2820 (La.08/16/02), 822 So.2d 613. Furthermore, *1048 even if an earlier date were to be used, defendant cannot complain that his statutory deadline was violated because his motion for speedy trial suspended the running of prescription. As held by this court in State v. Oliver, 34,292 (La.App.2d Cir.05/09/01), 786 So.2d 317, preliminary pleas suspend the running of prescription for bringing the case to trial under the speedy trial statute. Thus, the filing of defendant's pro se motion for speedy trial and the motion to quash the indictment filed by his attorney suspended the running of time before commencement of trial. In the instant case, the trial began on May 21, 2002, which is within one year from the trial court's ruling on the motions, which was on July 11, 2001.
The fundamental, constitutional right to a speedy trial discussed in Barker v. Wingo, supra, however, looks beyond the procedural points to determine whether the delays prevented the defendant from receiving a fair trial. The first factor, the length of time it took the state to file the indictment then bring the case to trial is fairly long. Therefore, we turn to the next factor, the reason for the delay. In this case, the reason for the delay cannot be placed solely upon the prosecution. While defendant contends that he did nothing to cause the delay, the converse is actually true. Defendant's out-of-the-country flight and the fact that there were pending charges in Jefferson Parish are certainly unattributable to the prosecution in this matter. Furthermore, while Lincoln Parish authorities could have sought an indictment and brought defendant to trial earlier, his day-to-day activities, inasmuch as he was incarcerated in another parish, were not affected by this delay. In response to defendant's argument that the detainer placed upon him by Lincoln Parish authorities kept him from bonding out in Jefferson Parish, the record shows that he either did not have the money to pay the bond in Jefferson Parish or simply chose not to pay for the bond, knowing he would at that time be taken to Lincoln Parish to face the instant charges.
Regarding the third factor set forth in Barker v. Wingo, supra, the defendant's assertion of his right, we recognize that defendant attempted to assert his right when he filed the pro se motion for a speedy trial and his counsel filed the motion to quash the indictment. It is not solely upon the state, however, that these motions were not timely set for hearing. As noted above, defendant filed several motions to continue the trial after the trial date had been set.
Finally, we consider the fourth factor, prejudice to the defendant or the potential impairment of presentation of his defense. Defendant points out that one of his alibi witnesses died in 2000 before defendant was indicted. This witness, like Dr. Banks who did testify, was a Grambling State University employee and would presumably have testified that defendant was on campus the day of the crime. Defendant also asserts that had he been brought to trial earlier, Dr. Banks would have had a better recall of the specific details of the time frame for his alibi. Defendant also contends that another witness, Tiffany, the alleged driver of the green Toyota Tercel, had moved from the area and was not available to testify at trial.
Dr. Banks testified to the same thing that the deceased witness would have allegedly stated: that he saw defendant on the campus at the approximate time of the crime. The crime, however, took place very close to the Grambling campus and any number of witnesses could have testified that they saw defendant on the campus at that time without ruling out the possibility that defendant could have committed *1049 the crimes, then gone to the campus. The pawn shop owner's testimony definitively placed defendant at his pawn shop immediately after the time frame of the crimes, which testimony was obviously given more weight by the jury. Finally, we note that the state's case was weakened by the passage of time as well. As the record reflects, several key witnesses were unable to recall particular details of the date of the crime. This assignment of error is without merit.

Conclusion
For the reasons set forth above, defendants' convictions and sentences are AFFIRMED.
NOTES
[1] All of the men, including the victim, Patrick Scott, were related to each other either as cousins or brothers.
[2] On cross-examination, Timothy related that instead of the window, he was in the doorway when the blanket was moved back.
[3] Glenn also viewed a photo line-up and immediately identified defendant as the shooter.
[4] A spent shell was found by officers outside the trailer in the area described by Mario.
[5] Mario viewed a photo line-up the day after the shooting and identified defendant as the shooter.
[6] Aquanita was subsequently arrested on drug charges and it was shown that around the time of the shooting, she was using cocaine and did not want to cooperate with the police.